**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before the Honorable Timothy J. Stanceu, Chief Judge**

YAMA RIBBONS AND BOWS CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

And

BERWICK OFFRAY LLC,

Defendant-Intervenor.

CIT Court No. 19-00047

PUBLIC DOCUMENT

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR BERWICK OFFRAY LLC IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Gregory C. Dorris
PEPPER HAMILTON LLP
Suite 600
2000 K Street, N.W.
Washington, DC 20006-1865
Tel: 202.220.1200
Fax: 202.220.1465

*Counsel to Berwick Offray LLC*

October 23, 2019

**TABLE OF CONTENTS**


I. INTRODUCTION ....1

II. STATEMENT PURSUANT TO RULE 56.2 ....2

A. Administrative Determination Under Review ....2

B. Issues Presented And Summary Of Argument ....3

III. STATEMENT OF FACTS ....4

IV. STANDARD OF REVIEW ....7

V. ARGUMENT ....8

A. Commerce Acted Lawfully In Applying AFA To Determine That Yama Received Subsidies From The EBC Program ....8

1. Commerce correctly determined to apply AFA to the GOC Regarding The EBC Program ....8

2 It was not unlawful to determine based on AFA that Yama received subsidies under the EBC Program ....11

B. Commerce's Use Of The 10.54% Rate As AFA For Yama's Receipt Of Subsidies From The EBC Program Was Reasonable And Supported By Substantial Evidence ....15

C. Commerce Acted Lawfully In Determining That The Provision Of Synthetic Yarn And Caustic Soda For LTAR Was Countervailable ....18

1. Commerce correctly determined to apply AFA to the GOC in determining that Yama's synthetic yarn and caustic soda suppliers were governmental authorities ....19

2. Commerce correctly determined that the provision of synthetic yarn and caustic soda was specific ....22

D. Commerce Correctly Calculated The LTAR Benchmark For Synthetic Yarn And Caustic Soda ....22

VI. CONCLUSION ....26

# TABLE OF AUTHORITIES

Page(s)

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B) ....................7

19 U.S.C. § 1677(5)(B)....................19, 21

19 U.S.C. § 1677e(d) ....................15, 16

19 U.S.C. § 1677e(d)(1)(A) ....................16

19 U.S.C. § 1677e(d)(1)(A)(i) ....................18

19 U.S.C. § 1677e(d)(1)(A)(ii) ....................17, 18

19 U.S.C. § 1677e(d)(2)....................16, 17, 18

19 U.S.C. § 1677e(d)(3)(B) ....................16, 18

**CASES**

*Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ....................11

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....................7

*Consol. Edison v. NLRB*, 305 U.S. 197 (1938)....................7

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)....................7

*Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (CIT 2010) ....................11, 12, 14

*FAG Kugelfischer Georg Schafer AG v. United States*, 25 CIT ___, 131 F. Supp. 2d 104 (2001)....................15

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ....................12, 13

*Guizhou Tyre Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 160, Slip Op. 18-40 (Oct. 17, 2018) ....................14

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)....................7

*RZBC Grp. Shareholding Co. v. United States*, 222 F. Supp. 3d 1196 (Ct. Int'l Trade 2017)....................11

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)....................8

*Timken Co. v. United States*, 240 F. Supp. 2d 1228 (Ct. Intl. Trade 2002) ............................15, 22

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ....................................................8

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ........................................................................8

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..................................................................7

*Zenith Radio Corp v. United States*, 437 U.S. 443 (1978) ................................................................8

**REGULATIONS**

19 C.F.R. § 351.511(a) ..........................................................................................................23, 24

19 C.F.R. § 351.511(a)(2) .................................................................................................................25

19 C.F.R. § 351.511(a)(2)(i) ..............................................................................................................24

19 C.F.R. § 351.511(a)(2)(ii) .............................................................................................................24

19 C.F.R. § 351.511(a)(2)(iv) .............................................................................................................25

**AGENCY DETERMINATIONS**

*Chlorinated Isocyanurates Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56560 (Sept. 22, 2014) ......................................................................13, 14

*Citric Acid and Certain Citrate Salts: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec, 31, 2014).......................................20

*Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China; Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70201 (Nov. 17, 2010).........................................................................................................17

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 52268 (Nov. 13, 2017)...................................................................................................4

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 11052 (Mar. 25, 2019)..............................................................................................2, 6

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2016*, 83 Fed. Reg. 50891 (Oct. 10, 2018)...........................................................6, 7, 15, 22

**OTHER AUTHORITIES**

Panel Report, *Brazil – Export Financing Programme for Aircraft – Second Recourse by Canada to Article 21.5 of the DSU*, WT/DS46/RW/2 ........................................11

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before the Honorable Timothy J. Stanceu, Chief Judge**

YAMA RIBBONS AND BOWS CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

And

BERWICK OFFRAY LLC,

Defendant-Intervenor.

CIT Court No. 19-00047

PUBLIC DOCUMENT

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR BERWICK OFFRAY LLC IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I. INTRODUCTION

The Government of China ("GOC") provides subsidies in the form of buyer's credits from the Export-Import Bank ("EX-IM Bank") of the People's Republic of China ("China"). The U.S. Department of Commerce ("Commerce") attempted to fully investigate the export buyer's credit ("EBC") Program to determine if plaintiff Yama Ribbons And Bows Co., Ltd. ("Yama") benefitted from the EBC Program, and to what extent. Neither the GOC nor Yama cooperated to the best of their ability to provide the information Commerce requested and needed to make its decisions on the receipt and amount of subsidies from the EBC Program. Yama claims that Commerce erred in determining to use adverse facts available ("AFA") to both

find that Yama received subsidies from the EBC Program and that the amount of these subsidies should be 10.54%.

Additionally, Yama uses synthetic yarn and caustic soda to produce the subject narrow woven ribbons with woven selvedge ("NWR"). Because the GOC did not cooperate to the best of its ability to provide the information Commerce requested and needed, Commerce applied AFA in determining that the privately-owned input suppliers of synthetic yarn and caustic soda that supplied Yama are governmental authorities under the statute, and that their provision of synthetic yarn and caustic soda for less than adequate remuneration ("LTAR") was a countervailable subsidy. Yama claims that Commerce erred in determining to use AFA to find that its privately-owned input suppliers are governmental authorities and that the provision of these inputs at LTAR was countervailable, and also claims that the calculation of the amount of the subsidy was flawed.

Defendant-Intervenor contends that all of Yama's claims are meritless. Accordingly, the Court should dismiss this action.

## II.   STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Under Review

The administrative determination under review is Commerce's final results in the countervailing duty ("CVD") administrative review *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 11052 (Mar. 25, 2019)("*Final Results*")(P.R. 118,

Unpublished P.R. 116), and accompanying Issues and Decision Memorandum ("*Final I&D Memo*")(P.R. 117).[1]

**B. Issues Presented And Summary Of Argument**

**1.** *Whether Commerce erred in using AFA to determine Yama received a benefit from the EBC Program?*

No, Commerce did not err in using AFA to determine Yama received a benefit from the EBC Program. Neither Commerce nor Yama cooperated to the best of their ability to provide the information Commerce requested and needed to make its decisions on the receipt and amount of the subsidies from the EBC Program.

**2.** *Whether Commerce erred in determining the AFA rate assigned to Yama for the EBC Program?*

No, Commerce did not err in determining the AFA rate assigned to Yama for the EBC Program. Commerce has an established hierarchy based on the applicable statute for determining the appropriate AFA in an administrative review for the benefits from the EBC Program. Application of that hierarchy resulted in the 10.54% rate applied to Yama.

**3.** *Whether Commerce erred in determining that the provision of synthetic yarn and caustic soda for LTAR was countervailable?*

No, Commerce did not err in determining that the provision of synthetic yarn and caustic soda for LTAR was countervailable. Commerce's application of AFA to find that Yama's privately-owned input suppliers are governmental authorities and that the provision of these inputs at LTAR was countervailable is fully consistent with the statute and Commerce's established practice.

---

[1] Citations to documents on the administrative record are denoted by "P.R." for public documents and "C.R." for confidential documents, followed by the document number assigned in the "Index to Administrative Record." This brief does not contain any confidential information subject to the judicial protective order.

    4. *Whether Commerce erred in its calculation of the benchmark for the provision of synthetic yarn and caustic soda for LTAR?*

No, Commerce did not err in its calculation of the benchmark for the provision of synthetic yarn and caustic soda for LTAR. Commerce's calculation followed the statute and its established practice.

## III. STATEMENT OF FACTS

Commerce initiated the annual administrative review at issue on November 13, 2017. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 52268 (Nov. 13, 2017)(P.R. 3). Commerce sent the GOC an initial questionnaire covering both the GOC and Yama that sought information necessary to make its required CVD margin determination. P.R. 4. Yama provided responses to Commerce's initial questionnaire. C.R. 1 and C.R. 2-10; P.R. 9 and P.R. 18-22. The GOC also provided a response to Commerce's initial questionnaire. C.R. 11; P.R. 24.

Commerce sent a second, additional questionnaire to both Yama and the GOC seeking information on certain additional subsidy programs. P.R. 28 and 29, respectively. Yama submitted a response to this additional questionnaire. C.R. 12-15; P.R. 34. Yama reported in that response that it all its suppliers of synthetic yarn and caustic soda were domestic, and that it had coordinated with the GOC to provide the list of producers/suppliers. C.R. 12, at 5-7; P.R. 34, at 5-7. Yama also claimed in that response that "none" of its "export" customers used or tried to obtain buyer's credits from EX-IM Bank during the period of review ("POR"). C.R. 12, at 10; P.R. 34, at 10. Yama further claimed that it had "contacted all its US customers" on the list that it had provided to the GOC, and confirmed no customers had obtained buyers' credit from China Ex-Im Bank in the POR. C.R. 12, at 10; P.R. 34, at 10.

The GOC submitted a response to this additional questionnaire. C.R. 16-18; P.R. 35-37. The GOC provided some information as to the ownership structure and basic registration information of the privately-owned suppliers of Yama's synthetic yarn and caustic soda, and some general information on these two industries in China. C.R. 16, at 16-58; P.R. 35, at 16-58. The GOC also provided some information on the operation of the EBC Program. C.R. 16, at 64-67; P.R. 35, at 64-67. The GOC further stated that it understood that Yama would be providing in its own questionnaire responses affidavits from its U.S. customers to the effect that none of the customers obtained any benefits under the EBC Program. C.R. 16, at 66; P.R. 35, at 66.

Having still not received complete responses and factual information from the GOC on the provision of goods at LTAR and the EBC Program, Commerce issued a supplemental questionnaire to the GOC. C.R. 19; P.R. 40.[2] Commerce specifically asked the GOC to provide information about the involvement of the Chinese Communist Party ("CCP") in each of the nine companies Yama identified as its privately-owned suppliers of synthetic yarn and caustic soda, and whether any individuals in management positions are CCP members. C.R. 19, at 2; P.R. 40, at 2. Commerce also specifically asked for documentation from the Ex-Im Bank of China to support the GOC's statement that none of Yama's U.S. customers used the EBC Program during the POR; for the original and English translation of the 2013 revisions to the Administrative Measures of Export Buyer's Credits of the Ex-Im Bank of China; and for a list of all partner/correspondent banks involved in disbursement of funds under the EBC

[2] Commerce also issued two more supplemental questionnaires to the GOC (P.R. 50 and 93), but none of the questions pertained to the EBC Program or the provision of goods at LTAR (at least as to the substantive issues raised before the Court). Commerce issued two supplemental questionnaires to Yama (P.R. 39 and 49), but none of the questions pertained to the EBC Program or the provision of goods at LTAR (at least as to the substantive issues raised before the Court).

Program. C.R. 19, at 5; P.R. 40, at 5. In its response, the GOC failed to provide direct and complete responses to these very specific supplemental questions. *See* C.R. 25-28; P.R. 44-47.

Commerce issued its preliminary results of review on September 7, 2017. *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2016*, 83 Fed. Reg. 50891 (Oct. 10, 2018)("*Preliminary Results*")(P.R. 108, Unpublished P.R. 95), and accompanying Issues and Decision Memorandum ("*Preliminary I&D Memo*")(P.R. 96). In connection with its *Preliminary Results*, Commerce placed on the record the October 2, 2018 memorandum "2016 Countervailing Duty Administrative Review of Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Additional Documents For The Preliminary Results." P.R. 97. One of the additional documents is a memorandum in part titled "An Analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379," which has as an attachment a memorandum titled "The relevance of the Chinese Communist Party for the limited purpose of determining whether particular enterprises should be considered to be 'public bodies' within the context of a countervailing duty investigation." *Id.*, at Attachment III.

Both the GOC and Yama challenged various aspects of Commerce's preliminary results, though several claims now raised by Yama before the Court were raised only by the GOC. P.R. 109 and 110, respectively. Berwick Offray filed a rebuttal brief opposing the arguments made by both the GOC and Yama. P.R. 113.

Commerce published the *Final Results* on October 10, 2018. P.R. 118, Unpublished P.R. 116. In its *Final I&D Memo*, Commerce found that the information on the record was insufficient to support it finding Yama had not received subsidies from the EBC

Program during the POR, and that AFA was warranted in finding Yama received subsidies from the EBC Program. P.R. 117, at Comments 3 and 4. As AFA, Commerce used the same 10.54% rate it used in the *Preliminary Results*. *Id.*, at Comment 3. Commerce further found that Chinese prices in the synthetic yarn and caustic soda markets are significantly distorted by the involvement of the GOC, and that the privately-owned input suppliers of synthetic yarn and caustic soda to Yama are governmental authorities. *Id.*, at Comment 1. Based on these findings, Commerce determined as AFA that the provision of synthetic yarn and caustic soda to Yama was countervailable, and followed the statutory and established hierarchy to determine the benchmark prices for calculating the amount of the subsidies. *Id.*

## IV. STANDARD OF REVIEW

The Court must sustain any determination, finding or conclusion made by Commerce unless it is "unsupported by substantial evidence or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). "Substantial evidence" is considered "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938); *see also Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ({s}ubstantial evidence is more than a "mere scintilla"). Even if two inconsistent conclusions may be drawn from the record evidence, it does not mean that Commerce's findings are not supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

The Court reviews Commerce's construction of a statutory provision by first determining "whether Congress has directly spoken to the precise question at issue" and has clearly expressed its purpose and intent in the statute. *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Court looks at the plain meaning of the text and may consider the

statute's structure and legislative history. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).

The Court assesses whether Commerce's interpretation is "sufficiently reasonable," only in those cases where the statute does not answer the question. *Zenith Radio Corp v. United States*, 437 U.S. 443, 450-51 (1978). Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). "[The Court] accord[s] substantial deference to Commerce's statutory interpretation, as [Commerce] is the 'master' of the antidumping laws." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995).

## V. ARGUMENT

### A. Commerce Acted Lawfully In Applying AFA To Determine That Yama Received Subsidies From The EBC Program

The first question raised by Yama is whether Commerce acted lawfully in applying AFA to determine that Yama received subsidies from the EBC Program. Yama claims that Commerce erred in determining to apply AFA to the GOC, and in using AFA to determine that Yama received subsidies from the EBC Program. The crux of Yama's claims is that both it and the GOC stated that none of Yama's customers used the EBC Program, and that any other information requested by Commerce and not provided by the GOC and Yama is irrelevant.

#### 1. Commerce correctly determined to apply AFA to the GOC Regarding The EBC Program

Commerce noted that in prior examinations of the EBC Program, it had found that EX-IM Bank (the authority administering this lending program), is the primary entity that possesses the supporting information and documentation that are necessary for Commerce to fully understand the operation of this program, which is a prerequisite to Commerce's ability to

verify the accuracy of Yama's claimed non-use of the program. P.R. 117, at 21-22.[3] Commerce requested information pertaining to the 2013 revisions to the program, a list of all third-party banks involved in the disbursement/settlement of export buyer's credits, and a list of all partner/correspondent banks involved in disbursement of funds under the EBC Program. C.R. 19, at 5; P.R. 40, at 5. The GOC did not provide all the information and documentation requested for Commerce to develop a complete understanding of this program.

As Commerce explained, "{t}his information is necessary for Commerce to understand the details of this program, including: the application process, internal guidelines and rules governing this program, interest rates used during the POR, and whether the GOC uses third party banks to disburse/settle export buyer's credits." P.R. 117, at 22. The GOC's refusal to provide this specific information clearly impeded Commerce's ability to conduct its investigation of this program.

Yama's only real argument regarding Commerce's specific requests for information on the EBC Program is "that these ancillary questions regarding the operation of the EBC Program were irrelevant" as to whether the GOC provided subsidies under the EBC Program to Yama. Yama Brf., at 28. But complete responses to these EBC Program questions were critical to determining whether the GOC provided subsidies to Yama.

As Commerce fully explained, information on the record indicated that the 2013 revisions affected important program changes, and such information was critical to understanding how export buyer's credits flow to and from foreign buyers and the EX-IM Bank.

[3] In evaluating the positions of the parties, the Court should keep in mind that the GOC has been involved in numerous CVD investigations and reviews, and that this review is not the first proceeding in which the GOC has confronted Commerce's request for information as to the operation of the EBC Program.

Commerce could not verify any claims of non-use without a complete understanding of the operation of the program.

Had the GOC provided the requested list of all third-party banks involved in the disbursement/settlement of subsidies under the EBC Program, Commerce could have followed-up with additional supplemental questions as to whether these third-party banks, as opposed to EX-IM Bank itself, provided subsidies under the EBC Program. Most significantly, had the GOC been fully cooperative and provided the details on the EBC Program requested, that information may have led to other evidence of the provision of subsidies to Yama or its customers from the EBC Program. Here, the GOC parsed its response in a very calculated manner such that it is not clear at all whether a third-party bank on behalf of EX-IM Bank may have provided subsidies to Yama or its customers under the EBC Program. The precise point of Commerce's supplemental questions was to get specific details on the operation of the EBC Program to determine based on specific facts on the record that no third-party bank provided subsidies to Yama or its customers under the EBC Program that were not reflected in EX-IM Bank's own records.

It also is clear that Yama itself would receive a benefit from credits provided to its customers under the EBC Program. Export credits if provided on preferential terms lower the cost of the subject narrow woven ribbons purchased by Yama's customers, which makes Yama's narrow woven ribbons a more favorable purchase as compared to other narrow woven ribbon producers and exporters.[4] For this reason, it is critical that Commerce fully explore possible

---

[4] This point with respect to export credits was explained eloquently in a World Trade Organization Panel Report:

> We note that PROEX III payments are made in support of export credits extended to the *purchaser*, and not to the *producer*, of Brazilian regional aircraft. In our view, however, to the extent Canada can establish that PROEX III payments allow the purchasers of a product to obtain export credits on terms more

(continued...)

payments to Yama's customers and whether any such payments were through Chinese banks other than EX-IM Bank itself. Both these issues could not be fully examined due to the failure of the GOC to provide the information requested by Commerce.

Commerce therefore acted reasonably in determining that it could not verify Yama's claims of non-use by it or its customers, because the GOC's failure to cooperate to the best of its ability prevented it from understanding the operation of the EBC Program following the 2013 changes to the program (including the involvement of third-party banks and the elimination of the $2 million contract threshold requirement). This same AFA determination following the 2013 changes to the EBC Program was upheld by the Court in *RZBC Grp. Shareholding Co. v. United States*, 222 F. Supp. 3d 1196, 1200-03 (Ct. Int'l Trade 2017). *See also Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1354-55 (Ct. Int'l Trade 2016)(upholding Commerce's application of AFA prior to the 2013 changes based on Commerce's inability to fully understand the operation of the EBC Program needed to verify non-use of the program using the respondent's and its customer's books and records).

**2. It was not unlawful to determine based on AFA that Yama received subsidies under the EBC Program**

Commerce had no other choice but to apply AFA to the GOC, and determine using AFA that Yama received a benefit from the EBC Program. In this particular case, Yama's reliance on *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (CIT 2010) is

---

(continued...)

> favourable than those available to them in the market, this will, at a minimum, represent a *prima facie* case that the payments confer a benefit on the *producers* of that product as well, as it lowers the cost of the product to their purchasers and thus makes their product more attractive relative to competing products. We do not understand the parties to dispute this proposition.

Panel Report, *Brazil – Export Financing Programme for Aircraft – Second Recourse by Canada to Article 21.5 of the DSU*, WT/DS46/RW/2, at para. V.74, fn. 42 (Jul. 26, 2001).

misplaced. The Court in *Essar Steel* recognized that in some cases the foreign government is in the best position to provide the needed information on the administration of a subsidy program, including eligible recipients. *Id.* The Court in *Essar Steel* further recognized that in some cases the individual respondent company may possess the information needed to determine whether that subsidy program conferred a benefit on that company. *Id.*

The Court's reasoning in *Essar Steel* is sound, except in a case like this one, where the benefit of the subsidy program can be conferred indirectly on the individual respondent company through an unrelated customer actually being the company that directly receives the subsidy under the program. Here, the foreign government (the GOC) also is in the best position to provide information to determine whether the subsidy program conferred a benefit on the individual respondent company, through the EBC financing being provided to the unrelated customer of that individual respondent company. Because the GOC had that information, application of AFA to the GOC on this factual point necessarily results in AFA applied to the individual respondent company, Yama.[5] This result comports with the Court's understanding in *Essar Steel* that in certain situations AFA applied to a foreign government will necessarily negatively impact an individual respondent company. *See also Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372-73 (Fed. Cir. 2014) (affirming Commerce's application of adverse inferences when the GOC did not provide requested information despite the respondents' cooperation).[6]

---

[5] Yama claims that foreign governments are not required to give confidential information to Commerce. Yama Brf., at 33. There is no evidence on the record that the data requested of the GOC could not be obtained by the GOC or released to Commerce by the GOC due to prohibitive confidentiality requirements. Yama's claim of confidentiality is an unsubstantiated allegation.

[6] Yama attempts to distinguish *Fine Furniture* on the basis that Commerce did not apply adverse inferences to substitute for any information that was actually submitted by the cooperating respondents. But here the missing
(continued...)

Yama also claims that Commerce cannot apply AFA to the GOC and have that decision negatively impact Yama when it was a cooperating party. Surprisingly, Yama references a Commerce review where the foreign respondents were fully cooperative and provided Commerce in their questionnaire responses statements from each of their customers in which each customer certified that it did not receive any financing from EX-IM Bank. Yama Brf., at 30 (citing *Chlorinated Isocyanurates Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56560 (Sept. 22, 2014), and accompanying Issues and Decision Memorandum).

But Yama did not emulate these respondents and submit to Commerce statements or declarations from its customers certifying to the fact that each received no funding from EX-IM Bank directly or indirectly through any third-party bank.[7] Rather, Yama claims it simply "contacted all its US customers . . . and confirmed that no customer obtained buyers' credit from China Ex-Im Bank in the POR." C.R. 12, at 10; P.R. 34, at 10.

But exactly what did Yama ask its U.S. customers, and what did they say. Did Yama only ask whether its customers received credits from EX-IM Bank, and not ask about third-party banks? Whom did it ask at its customers? Was it someone who would have actual knowledge or just someone they deal with regularly? Did the customers even fully understand what was being asked? Why does Yama limit the customers it contacted to its "US customers"

---

(continued...)

information on non-use can only be confirmed through the GOC, not the cooperating party, and therefore the decision in *Fine Furniture* supports application of AFA even should this Court find Yama was fully cooperative.

[7] What is more surprising is that the GOC explicitly stated in its supplemental response that "{t}he GOC understands that the Respondent Company is providing in its own questionnaire responses affidavits from their US customers to the effect that none of the customers obtained any Export Buyers Credits from the EX-IM Bank." C.R. 16, at 66; P.R. 35, at 66. Yama never provided any such affidavits.

only, but claim no "export" customers received buyer's credits from EX-IM bank? Are export customers the only Yama customers who could apply for benefits under the EBC Program? Why did Yama only contact its U.S. customers (what about a foreign customer importing into the United States)? Unlike the *Chlorinated Isocyanurates* review Yama references, there are no documents to support Yama's refrain that it received "no" subsidies under the EBC Program directly, or indirectly through its customers. Yama did not act to the best of its ability to provide such documentation, despite apparently being aware of a methodology that had been successful in a prior review.

Because Yama only claims to have contacted its U.S. customers and asked them, and it did not submit affidavits or declarations from each of its customers certifying to the fact that they received no funding from EX-IM Bank directly or indirectly through any third-party bank, the recent decision in *Guizhou Tyre Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 160, Slip Op. 18-40 (Oct. 17, 2018), is inapposite. In that case, the Court emphasized that it was because the respondent had submitted the declarations of non-use from its customers that Commerce had a clear path to find non-use by either accepting the declarations submitted by the plaintiffs and its customers or by verifying these declarations. *Id.*, at 9. Here, absent such declarations, Commerce had no such clear path, but only unsupported claims of non-use from Yama based on some alleged form of contact with some of its customers that is neither documented nor described in any detail. As the Court in *Essar Steel* concluded, if the company fails to act to the best of its ability, Commerce will find that such company "both used and benefitted from the subsidy program during the period of review." *Essar Steel*, 721 F. Supp. at 1297.

**B. Commerce's Use Of The 10.54% Rate As AFA For Yama's Receipt Of Subsidies From The EBC Program Was Reasonable And Supported By Substantial Evidence**

Having determined that the GOC had not cooperated to the best of its ability and that by application of AFA Yama received subsidies from the EBC Program, Commerce had to determine a countervailable subsidy rate to use as AFA. To determine this AFA rate, Commerce followed the applicable statute and its established hierarchy and practice. As Commerce fully explained in its *Preliminary Results*, Section 776(d) of the Tariff Act of 1930, 19 U.S.C. § 1677e(d), allows it to "use as AFA a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates." P.R. 96, at 12. Based on application of this hierarchy, Commerce selected as AFA the rate of 10.54% *ad valorem*, which was the highest rate determined for a subsidy program from a proceeding that Commerce considered reasonable to use.

Yama challenges Commerce's selection of the 10.54% rate as AFA. Yama claims now as the GOC did below that Commerce failed to follow its CVD AFA hierarchy in assigning an AFA rate to the EBC Program.[8] Yama claims the assigned AFA rate is for a preferential

[8] Yama itself did not challenge the 10.54% rate selected as AFA in its case brief to Commerce contesting the *Preliminary Results* in the underlying review. *See* P.R. 110. However, the GOC did challenge the AFA rate selected in its case brief, including claims that Commerce did not follow its AFA rate selection hierarchy and that Commerce failed to corroborate the AFA rate selected. *See* P.R. 109, at 8-11. Because Commerce did in fact consider the GOC's claims, and in light of the overlap in the claims now raised by Yama with those raised below by the GOC, Defendant-Intervenor does not argue that Yama's claims should be dismissed for failure to exhaust its administrative remedies. *See Timken Co. v. United States*, 240 F. Supp. 2d 1228, 1238 (Ct. Intl. Trade 2002) ("A party 'may be excused from its failure to raise the issue before Commerce [where] Commerce in fact considered the issue.' *FAG Kugelfischer Georg Schafer AG v. United States*, 25 CIT ___, ___, 131 F. Supp. 2d 104, 114 (2001)").

lending program for an unrelated industry. Yama claims that Commerce should have used as AFA a rate from what it deems a similar or comparable program within the same proceeding.

The statute here is very explicit with respect to the hierarchy Commerce may use in selecting an AFA subsidy rate:

> **(d) Subsidy rates and dumping margins in adverse inference determinations**
>
> > **(1) In general** If the administering authority uses an inference that is adverse to the interests of a party under subsection (b)(1)(A) in selecting among the facts otherwise available, the administering authority may—
> >
> > > (A) in the case of a countervailing duty proceeding—
> > >
> > > > (i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or
> > > >
> > > > (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use;
> > > >
> > > > . . . .

19 U.S.C. § 1677e(d)(1)(A). The statute further provides that Commerce has the discretion to apply the highest subsidy rate based on its evaluation of the situation that resulted in its using an adverse inference. 19 U.S.C. § 1677e(d)(2). Commerce also is not required among others to demonstrate that the countervailable subsidy rate or dumping margin it used reflects an alleged commercial reality of the interested party. 19 U.S.C. § 1677e(d)(3)(B).

Consistent with the Section 1677e(d) hierarchy and its established practice, Commerce first determined that there was not an identical program from any segment of the proceeding, as it had not previously calculated a rate for the EBC Program in any NWR

proceeding. Commerce then determined that there was no similar/comparable program (based on the treatment of the benefit) within the same proceeding, excluding *de minimis* rates. Since it found no identical or similar/comparable programs, Commerce used the calculated rate from a non-company specific program in another China CVD case. The use of this rate is fully consistent with the statutory hierarchy pursuant to Sections 1677e(d)(1)(A)(ii) and 1677e(d)(2).

Commerce rejected the GOC's claim below that Commerce should use the rate calculated for the Policy Loans to Narrow Woven Ribbons Producers from State-Owned Commercial Banks program, because it is a similar/comparable program in this proceeding. Commerce stated that the rate calculated for this program is 0.03% *ad valorem*, and that its established practice in selecting AFA program rates is to treat rates of less than 0.5% to be *de minimis*. P.R. 117, at 25. The practice of not assigning a *de minimis* rate as AFA is a proper exercise of the discretion granted it under Section 1677e(d)(2). For this same reason, Yama's suggestion in its brief now (Yama Brf., at 35) that Commerce should use the International Market Development Fund Grants for Small and Medium Enterprises similarly must be rejected, as that 0.21% subsidy rate also is *de minimis*.

Yama's claims that the 10.54% subsidy rate selected from the determination in *Coated Paper*[9] is not similar or comparable to the EBC Program subsidies, and that the NWR industry could not obtain the preferential loans provided to the coated paper industry in China. Yama Brf., at 33-34. But the application of Section 1677e(d)(1)(A)(ii) does not require that the countervailable subsidy rate be for a similar or comparable subsidy program like Section

[9] Commerce in its *Preliminary I&D Memo* cited to the determination in *Truck and Bus Tires from the People's Republic of China* for the 10.54% rate for the EBC Program. P.R. 96, at 13. Commerce clarified in its *Final I&D Memo* that the 10.54% was a revised rate for the "Preferential Lending to the Coated Paper Industry" program determined in *Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China; Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70201 (Nov. 17, 2010). P.R. 117, at 25.

1677e(d)(1)(A)(i) requires. Section 1677e(d)(1)(A)(ii) only requires that Commerce consider the countervailable subsidy rate reasonable to use. There also is no requirement that Commerce demonstrate that the NWR industry be able to use the subsidy program, as Section 1677e(d)(3)(B) provides that Commerce does not have to show that the AFA subsidy rate used reflects an alleged commercial reality (which can be interpreted to refer to either the amount of the subsidy or to whether the interested party could use the subsidy program from which the AFA subsidy rate is selected).

Yama's claim that the 10.54% rate is punitive also is defeated by the statute. As discussed, Section 1677e(d)(2) provides Commerce discretion to apply the highest subsidy rate based on its evaluation of the situation that resulted in its using an adverse inference. Commerce evaluated the GOC's failure to cooperate here and properly concluded that the 10.54% rate was an appropriate AFA rate. That Yama would prefer a much lower rate does not make the 10.54% rate too high, or punitive.

### C. Commerce Acted Lawfully In Determining That The Provision Of Synthetic Yarn And Caustic Soda For LTAR Was Countervailable

Commerce determined that the provision of synthetic yarn and caustic soda to Yama for LTAR was countervailable. Commerce requested that the GOC provide certain information concerning each of these industries in China for the POR in order to determine whether the GOC is the predominant provider of these inputs in China and whether its significant presence in the market distorts all transaction prices. P.R. 29, at 3-9. *See also* C.R. 19, at 2-4; P.R. 40, at 2-4. Commerce determined that the GOC withheld necessary information that was requested, and failed to cooperate by not acting to the best of its ability to comply with the request for information. P.R. 96, at 7-8; P.R. 117, at 10-11. As a result, Commerce used AFA in finding that prices from actual transactions involving Chinese buyers and sellers are significantly

distorted by the involvement of the GOC, and that therefore an external benchmark was warranted for calculating the benefit for the provision of synthetic yarn and caustic soda for LTAR.[10] *Id.*

Commerce further requested certain information from the GOC regarding the companies that produced the synthetic yarn and caustic soda input products that Yama purchased during the POR, in order to determine whether these producers are "authorities" within the meaning of Section 771(5)(B) of the Tariff Act of 1930, as amended ("the Act"), 19 U.S.C. § 1677(5)(B). C.R. 19, at 2; P.R. 40, at 2. Commerce determined that the GOC withheld necessary information that was requested, and failed to cooperate by not acting to the best of its ability to comply with the request for information. P.R. 96, at 9-10; P.R. 117, at 11-12. As a result, Commerce used AFA in finding that Yama's privately-owned input suppliers of synthetic yarn and caustic soda are "authorities," within the meaning of Section 771(5)(B) of the Act. *Id.*

**1. Commerce correctly determined to apply AFA to the GOC in determining that Yama's synthetic yarn and caustic soda suppliers were governmental authorities**

In making the determination that Yama's privately-owned input suppliers of synthetic yarn and caustic soda are "authorities," Commerce specifically requested that the GOC provide information about the involvement of the Chinese Communist Party ("CCP") in each of the companies, including whether individuals in management positions were CCP members. The GOC did not identify any owners, members of the board of directors, or managers of the input suppliers who were government or CCP officials during the POR. Consequently, as AFA, Commerce found that CCP officials were present in each of Yama's privately-owned input

[10] Defendant-Intervenor notes that Yama does not challenge on appeal Commerce's determinations that the prices from actual transactions involving Chinese buyers and sellers are significantly distorted by the involvement of the GOC, or that use of an external benchmark was warranted for calculating the benefit for the provision of synthetic yarn and caustic soda for LTAR.

suppliers as individual owners, managers and members of the boards of directors, and that this gave the CCP, as the government, meaningful control over the companies and their resources.

Yama claims first that the GOC did act to the best of its ability to provide the information concerning CCP's involvement in Yama's privately-owned input suppliers.  Yama Brf. at 37.  According to Yama, Commerce should have simply accepted the GOC's claim that there was no central informational database to search for the requested information.

But Commerce explained that this GOC claim was not acceptable, because Commerce previously had found that the GOC in fact could obtain such information, and independent from the involved companies.  Commerce further had determined that statements from the involved companies, rather than from the GOC or CCP themselves, were not sufficient. P.R. 96, at 9 (citing *Citric Acid and Certain Citrate Salts: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78799 (Dec, 31, 2014) (*Citric Acid 2012 AR*), and accompanying Issues and Decision Memorandum, at Comment 5 (*see also* pages 4-5 thereto)); P.R. 117, at 11-12 (citing *Citric Acid 2012 AR*, at Comment 5 (*see also* pages 4-5 thereto)).

Even if the GOC were correct that there was no central informational database to search for the requested information, that would not be a sufficient or complete response.  The GOC did not suggests that it was prevented or incapable of seeking the requested information on the nine companies involved.  Certainly the GOC could have done independent specific research on each of the owners, members of the board of directors, and managers of the few (nine) input suppliers at issue to determine which were government or CCP officials.  The GOC in fact did just that in *Citric Acid 2012 AR* in providing information on the management of some companies. *See Citric Acid 2012 AR*, Issues and Decision Memorandum, at page 5 ("However, the GOC's claims concerning its access to information concerning CCP officials conflict with its

ability to provide verifiable CCP information with regard to individuals at two calcium carbonate producers, Companies B and C, which the GOC obtained on its own and not from the input producers themselves."), and at Comment 2. The GOC's failure to do so here for each of the nine companies identified is alone sufficient justification for Commerce's use of AFA.

Yama claims second that regardless of whether there was CCP involvement in its privately-owned input suppliers, the record demonstrates that such involvement could never rise to any level of meaningful government control. Yama Brf., at 37-42. Yama attacks the conclusions in Commerce's Public Body Memorandum that discusses how such CCP involvement could potentially result in significant government control such that a privately-controlled Chinese company could still be found an "authority" under 19 U.S.C. § 1677(5)(B).

Yama's attacks are insufficient to either overcome the conclusions in Commerce's Public Body Memorandum or the GOC's failure to provide the requested information on the involvement of the party members in the nine identified companies. Despite Yama's cursory, unsupported, and cherry-picked claims, the conclusions in Commerce's Public Body Memorandum stand. In particular, not undermined by Yama's claims are the conclusions relied on here by Commerce "that the CCP exerts significant control over economic activities in China," and that "an entity with significant CCP presence on its board or in management or in party committees may be controlled such that it possesses, exercises, or is vested with governmental authority." P.R. 117, at 12.

More significantly, knowing exactly which management roles CCP members may have held and how high up in the CCP these persons were, or if there were party committees, could have resulted in invaluable information for the assessment by Commerce as to whether a particular privately-owned company was controlled by the Chinese government. As noted in

Commerce's Public Body Memorandum, "{t}his determination would be conducted on a case-by-case basis." P.R. 97, at Attachment III, page 38. The GOC's failure to provide the information requested by Commerce directly impeded Commerce from conducting this necessary case-by-case analysis in the review at issue here.

**2. Commerce correctly determined that the provision of synthetic yarn and caustic soda was specific**

On the presumption that it proved in its Rule 56.2 brief that the GOC acted to the best of its ability to provide data on the synthetic yarn and caustic soda industries in China, Yama claims that Commerce cannot use AFA to determine that the provision of synthetic yarn and caustic soda was specific.

As discussed above, Yama's Rule 56.2 brief in no way proves the GOC acted to the best of its ability in providing the information requested, or that AFA was not warranted. Precisely because Commerce had to use AFA, it was reasonable for Commerce to determine as AFA that the provision of synthetic yarn and caustic soda was specific.

**D. Commerce Correctly Calculated The LTAR Benchmark For Synthetic Yarn And Caustic Soda**

Having determined that the GOC had not cooperated to the best of its ability and that by application of AFA Yama received subsidies from the provision of synthetic yarn and caustic soda, Commerce had to determine a countervailable subsidy rate to use as AFA. To determine this AFA rate, Commerce calculated a benchmark following the applicable law and its established practice. Yama challenges Commerce's LTAR benchmark calculation.[11]

[11] Yama itself did not challenge the calculation of the LTAR benchmark in its case brief to Commerce contesting the *Preliminary Results* in the underlying review. *See* P.R. 110. However, the GOC did challenge the calculation of the benchmark in its case brief. *See* P.R. 109, at 18-23. Yama's claims here are verbatim to those of the GOC. Yama Brf., at 42-47. Because Commerce did in fact consider the GOC's claims, Defendant-Intervenor does not argue that Yama's claims should be dismissed for failure to exhaust its administrative remedies. *See Timken,* 240 F. Supp. at 1238.

Commerce selected the benchmarks for measuring the adequacy of the remuneration for synthetic yarn and caustic soda in accordance with 19 C.F.R. § 351.511(a), which provides as follows:

> **§ 351.511 Provision of goods or services.**
>
> (a)Benefit -
>
> > (1)In general. In the case where goods or services are provided, a benefit exists to the extent that such goods or services are provided for less than adequate remuneration. See section 771(5)(E)(iv) of the Act.
> >
> > (2) "Adequate Remuneration" defined -
> >
> > > (i)In general. The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions. In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.
> > >
> > > (ii)Actual market-determined price unavailable. If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.
> > >
> > > (iii)World market price unavailable. If there is no world market price available to purchasers in the

> country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.
>
> (iv)Use of delivered prices. In measuring adequate remuneration under paragraph (a)(2)(i) or (a)(2)(ii) of this section, the Secretary will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product. This adjustment will include delivery charges and import duties.

19 C.F.R. § 351.511(a). Because Commerce as AFA determined that actual transaction prices for synthetic yarn and caustic soda in China are significantly distorted by the government's involvement in the market, it determined that domestic prices in China could not serve as viable, tier-one benchmark prices, pursuant to Section 351.511(a)(2)(i). It further determined that import prices into China could not serve as a benchmark for the same reason. Having made these determinations, Commerce applied a tier-two benchmark based on world market prices available to purchasers in China, pursuant to Section 351.511(a)(2)(ii).

Commerce used the prices submitted by Berwick-Offray as a tier-two benchmark. When Commerce measures the adequacy of remuneration under tier-two, it adjusts the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery charges and import duties. So to derive the benchmark prices here, Commerce included international freight, using data submitted by Berwick-Offray. Commerce also included the value added tax ("VAT") in the benchmark prices.

Yama claims that to be consistent with prevailing market conditions the tier-two benchmark prices should not be inclusive of ocean freight or VAT. Yama Brf., at 42. With respect to VAT, Yama claims that the VAT ultimately would be rebated or offset when the final

product was exported, and therefore is not properly included in the purchased input benchmark. *Id.*, at 46.

Commerce correctly rejected these claims. As required by 19 C.F.R. § 351.511(a)(2)(iv), Commerce is required to adjust the benchmark prices to reflect the price a firm actually paid or would pay if it imported the product, while also making adjustments for delivery charges and import duties. So Commerce is required to add freight, import duties, and VAT to the world prices in order to estimate what Yama would have paid if it imported the product. Since VAT is a costs an importer would have paid, VAT must be included in the benchmark.

Yama's claim that VAT is not part of the synthetic yarn and caustic soda costs because it would be rebated when the NWR produced from it is exported ignores the regulatory requirements, and was properly rejected by Commerce. Consistent with its past practice, Commerce has found that 19 C.F.R. § 351.511(a)(2) does not even contemplate much less mandate that future reimbursements for refunds or taxes must be part of the benchmark calculation. P.R. 117, at 13. Rather, Commerce is required by its regulation "to evaluate the purchases in the form in which they are made." *Id.* It is not unreasonable for Commerce to conclude that "{w}hether a firm recovers VAT after delivery of the input is immaterial to the delivered price that Commerce must use as the comparison price under 19 C.F.R. § 351.511(a)(2)(iv)." *Id.*

## VI. CONCLUSION

For all the foregoing reasons, Berwick Offray respectfully requests that the Court deny Plaintiff's Rule 56.2 motion for judgment on the agency record. Berwick Offray further asks that the Court dismiss Plaintiff's action with prejudice.

Respectfully submitted,

Gregory C. Dorris
PEPPER HAMILTON LLP
Suite 600
2000 K Street, N.W.
Washington, DC 20006-1865
Tel: 202.220.1200
Fax: 202.220.1465

*Counsel to Berwick Offray LLC*

October 23, 2019

*CERTIFICATE OF COMPLIANCE*

Pursuant to Standard Chambers Procedures, ¶ 2(B)(2), the undersigned hereby certifies that the above Response Brief in opposition to Plaintiff's Rule 56.2 motion for judgment on the agency record complies with the Court's word limitation, and that the number of words in the brief is 6,762 (based on the word count of the word-processing system used to prepare this brief).

**BY:**
Gregory C. Dorris
PEPPER HAMILTON LLP