Slip Op. No. 21-50

UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **YAMA RIBBONS AND BOWS CO., LTD.** |
| Plaintiff, |
| v. |
| **UNITED STATES,** |
| Defendant, |
| and |
| **BERWICK OFFRAY LLC,** |
| Defendant-Intervenor. |

Before:  Timothy C. Stanceu, Judge

Court No. 19-00047

OPINION AND ORDER

[Ordering remand of an agency determination in a countervailing duty proceeding on narrow woven ribbons with woven selvedge from the People's Republic of China.]

Dated:  April 30, 2021

*John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co, Ltd.  With him on the brief were *Alexandra H. Salzman*, *Judith L. Holdsworth*, and *J. Kevin Horgan*.

*Kara M. Westercamp*, Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Gregory C. Dorris*, Pepper Hamilton LLP, of Washington D.C., for defendant-intervenor Berwick Offray LLC.

Stanceu, Judge:  Plaintiff Yama Ribbons and Bows Co., Ltd. ("Yama") contests an administrative determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the sixth periodic administrative review of a countervailing duty ("CVD") order on narrow woven ribbons with woven selvedge from the People's Republic of China ("China" or the "PRC").  Ruling in favor of plaintiff, the court remands the determination to Commerce for appropriate corrective action.

## I. Background

### A. The Contested Determination

The contested determination (the "Final Results") is *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 11,052 (Int'l Trade Admin. Mar. 25, 2019) ("*Final Results*").

### B. The Administrative Review, Preliminary Results, and Final Results

Commerce issued the countervailing duty order (the "Order") on narrow woven ribbons with woven selvedge from China (the "subject merchandise") in 2010.  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Countervailing*

*Duty Order*, 75 Fed. Reg. 53,642 (Int'l Trade Admin. Sept. 1, 2010) (the "*Order*").[1]

Commerce initiated the sixth review on November 13, 2017 upon the request of Berwick

Offray LLC ("Berwick Offray"), the petitioner in the countervailing duty investigation

and the defendant-intervenor in the present action.  *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 52,268 (Int'l Trade Admin.

Nov. 13, 2017).  The review pertained to entries of subject merchandise made during the

period of review ("POR") of January 1, 2016 through December 31, 2016.  *Id.* at 52,273.

Commerce identified Yama as the sole exporter or producer of the subject merchandise

to be reviewed.  *Id.*

Commerce published the preliminary results of the review ("Preliminary

Results") on October 10, 2018.  *Narrow Woven Ribbons With Woven Selvedge From the*

*People's Republic of China: Preliminary Results of Countervailing Duty Administrative*

*Review; 2016*, 83 Fed. Reg. 50,891 (Int'l Trade Admin. Oct. 10, 2018), P.R. Doc. 108, J.App.

---

[1] The countervailing duty order applies generally to woven ribbons 12
centimeters or less in width, and of any length, that are composed in whole or in part
of man-made fibers and that have woven selvedge.  Some exclusions apply.  *Narrow
Woven Ribbons With Woven Selvedge From the People's Republic of China: Countervailing
Duty Order*, 75 Fed. Reg. 53,642, 53,642–43 (Int'l Trade Admin. Sept. 1, 2010).  The
term "selvedge" refers to "the edge on either side of a woven or flat-knitted fabric so
fashioned as to prevent raveling."  *Selvage or selvedge*, WEBSTER'S THIRD NEW
INTERNATIONAL DICTIONARY UNABRIDGED (2002).

at 51 ("*Preliminary Results*").[2]  Commerce preliminarily assigned Yama a total net

countervailable duty subsidy rate of 23.70%.  *Id.*  Commerce incorporated an

explanatory document into the Preliminary Results by reference.  *Decision Memorandum*

*for Preliminary Results of 2016 Countervailing Duty Administrative Review: Narrow Woven*

*Ribbons with Woven Selvedge from the People's Republic of China* (Int'l Trade Admin. Oct. 3,

2018), P.R. Doc. 95, J.App. at 44 ("Preliminary Results Mem.").

The Final Results also incorporated by reference an explanatory memorandum,

the "Final Decision Memorandum."  *Decision Memorandum for the Final Results of 2016*

*Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge*

*from the People's Republic of China* (Int'l Trade Admin. Mar. 19, 2019), P.R. Doc. 117,

J.App. at 14 ("Final Decision Mem.").  In the Final Results, Commerce determined that

Yama benefited from 16 subsidy programs and calculated the subsidy rate for each, as

follows: (1) Policy Loans to Narrow Woven Ribbon Producers from State-owned

Commercial Banks, 0.03%; (2) Income Tax Reduction for High and New Technology

Enterprises, 0.41%; (3) Preferential Tax Policy for Wages of Disabled Employees, 0.01%;

---

[2] The information disclosed in this Opinion and Order is included in public
versions of record documents, public versions of the parties' submissions, and other
information subsequently made public in issuances by Commerce.  All citations to
record documents are to the public versions of those documents.  All citations to the
"J.App." are to the Joint Appendix, Public Version (Dec. 10, 2019), ECF No. 35.

(4) Provision of Synthetic Yarn for Less-than-Adequate Remuneration ("LTAR"),

10.45%; (5) Provision of Caustic Soda for LTAR, 0.26%; (6) Provision of Electricity for

LTAR, 1.07%; (7) Export Buyer's Credit Program, 10.54%; (8) Xiamen Municipal Science

and Technology Grant Program, 0.34%; (9) International Market Development Fund

Grants for Small and Medium-sized Enterprises, 0.21%; (10) Assistance for Recruiting

Rural Labor, 0.04%; (11) Assistance for Recruiting Vocational Institution and/or College

Graduates, 0.03%; (12) Insurance Expense Assistance, 0.09%; (13) Interest Assistance for

Loans Obtained for Technology Projects, 0.18%; (14) Assistance for Textile Exhibition,

0.01%; (15) Training Fee Rebate, 0.01%; and (16) Payments from Xiamen Commerce

Bureau, 0.02%.  Final Decision Mem. 3–5.

Aggregating the various subsidy rates for the Final Results, Commerce assigned

Yama a total net countervailable duty subsidy rate of 23.70%, which was unchanged

from the rate Commerce calculated in the Preliminary Results.  *Final Results*,

84 Fed. Reg at 11,052.

In the instant action, Yama contests the Department's including in the 23.70%

total subsidy rate the 10.54% subsidy rate for the Export Buyer's Credit Program and

the subsidy rates for the provision of synthetic yarn (10.45%) and caustic soda (0.26%)

for less-than-adequate remuneration.

### C. Proceedings in the Court of International Trade

Yama brought this action in April 2019.  Compl. (Apr. 9, 2019), ECF No. 6.  Before

the court is Yama's motion for judgment on the agency record under USCIT Rule 56.2.

Pl. Yama Ribbons and Bows Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. (Aug. 9,

2019), ECF No. 25 ("Pl.'s Mot."); Mem. of Law in Supp. of Pl. Yama Ribbons and Bows

Co., Ltd.'s 56.2 Mot. for J. upon the Agency R. (Aug. 9, 2019), ECF No. 26 ("Pl.'s Br.").

Yama's motion is opposed by defendant United States, Def.'s Resp. in Opp'n to

Pl.'s Mot. for J. upon the Agency R. (Oct. 23, 2019), ECF No. 30 ("Def.'s Br."), and by

defendant-intervenor Berwick Offray, Resp. Br. of Def.-Int. Berwick Offray LLC in

Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Oct. 23, 2019), ECF No. 29

("Def.-Int.'s Br.").  Defendant and defendant-intervenor urge the court to sustain the

Final Results.

The court held oral argument on Yama's motion on February 13, 2020.  Oral

Argument (Feb. 13, 2020), ECF No. 39.  At oral argument, the court requested

supplemental briefing on a specific issue the court considered unresolved by the

parties' presentations, which was whether Commerce included a 17% value-added tax

in the comparison price when assessing the adequacy of renumeration for two

production inputs, synthetic yarn and caustic soda.  Defendant answered the court's

inquiry affirmatively.  Def.'s Resp. to the Ct.'s Req. for Suppl. Briefing (Mar. 16, 2020),

ECF No. 41.  Yama concurred with defendant's answer.  Pl.'s Reply to Def.'s Resp. to

the Ct.'s Req. for Suppl. Briefing (Mar. 23, 2020), ECF No. 42.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts

Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions

commenced under section 516A of the Tariff Act of 1930, *as amended* ("Tariff Act"),

19 U.S.C. § 1516a, including an action contesting a final determination that Commerce

issues to conclude an administrative review of a countervailing duty order.  *See id*.

§ 1516a(a)(2)(B)(iii).[3]

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  *Id*. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[3] All citations to the United States Code are to the 2012 edition.

## B. Countervailing Duties under the Tariff Act

Where certain conditions are met, the Tariff Act provides for the imposition of a

"countervailing duty" on imported merchandise to redress a subsidy provided by the

government of the exporting country.  Section 701(a) of the Tariff Act, 19 U.S.C.

§ 1671(a), directs generally that Commerce is to impose a countervailing duty if:

(1) Commerce determines that an "authority," defined as either the government of a

country or any public entity within the territory of the country, *id*. § 1677(5)(B), "is

providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States"; and (2) the U.S.

International Trade Commission determines that an industry in the United States is

materially injured or threatened with material injury by reason of the subsidized

imports.

A "countervailable subsidy" exists, generally, where an authority provides a

financial contribution to a person and a benefit is thereby conferred, and the subsidy

meets the requirement of "specificity," which is determined according to various rules

set forth in the statute.  *Id.* § 1677(5), (5A).  When subsidies consist of the provision of

goods or services rather than the provision of monies directly, a benefit is conferred if

those goods or services are provided for less than adequate renumeration.  *Id.*

§ 1677(5)(E)(iv).

### C. The Export Buyer's Credit Program

Yama claims that Commerce unlawfully included in Yama's overall subsidy rate

of 23.70% a subsidy rate of 10.54% that Commerce assigned to China's "Export Buyer's

Credit Program" ("EBCP"), an export-promoting loan program administered by the

Export-Import Bank of China ("Ex-Im Bank").  Pl.'s Br. 15–32.  In the alternative, Yama

claims that the 10.54% subsidy rate Commerce imposed on Yama and attributed to the

program was derived from information pertaining to an industry dissimilar to the

woven ribbon industry and was punitive.  *Id.* at 33–35.

In the sixth review, Commerce included a rate for the EBCP in Yama's overall

subsidy rate without reaching a factual finding that Yama actually received a benefit

from the EBCP.  Instead, Commerce stated its primary finding in the negative: "In these

final results, we continue to find that the information on the record does *not* support

finding that Yama did *not* use the Export Buyer's Credit program during the POR."

Final Decision Mem. 21 (emphasis added).  At issue is the statutory requirement that

Commerce, in order to impose a countervailing duty, find that an authority provided a

financial contribution "to a person and a benefit is thereby conferred."  19 U.S.C.

§ 1677(5)(B).  Rather than make the affirmative finding that a financial contribution was

provided to Yama and a benefit was thereby conferred, Commerce inferred a

contribution and benefit to Yama by invoking its "facts otherwise available" authority

under 19 U.S.C. § 1677e(a) and its "adverse inference" authority under 19 U.S.C.

§ 1677e(b).[4]  As explained below, Commerce found, with respect to § 1677e(a), that the

government of China ("GOC") withheld requested information and significantly

impeded the proceeding and found, with respect to § 1677e(b), that the Chinese

government failed to cooperate by not acting to the best of its ability to comply with the

Department's requests for information.

Based on its review of the administrative record for the Final Results, the court

holds that the Department's use of facts otherwise available and an adverse inference

did not suffice to support a subsidy rate related to the EBCP.  Most significantly,

Commerce disregarded record evidence that Yama did not benefit from the EBCP and

overlooked the lack of record evidence from which Commerce could conclude that it

had.  Commerce deemed Yama to have benefitted from the EBCP by resorting to facts

otherwise available, and an adverse inference, reasoning that the government of the

PRC failed to provide certain requested information.  As the court explains below, the

record evidence does not support a finding that the information Commerce lacked as a

---

[4] When using both provisions, Commerce refers to "adverse facts available" or
"AFA."

result of non-cooperation by the Chinese government prevented Commerce from

relying upon or verifying the information Yama provided to show the absence of a

benefit from the EBCP.  Because the court concludes that Commerce acted unlawfully in

its use of facts otherwise available, and an adverse inference, to include a rate for the

EBCP in the overall subsidy rate, the court does not reach Yama's alternative claim that

the subsidy rate of 10.54% was improperly derived.

 Commerce is directed to use "facts otherwise available" in various

circumstances, as set forth in 19 U.S.C. § 1677e(a).  Commerce is directed, generally, to

use facts otherwise available when: "(1) necessary information is not available on the

record, or (2) an interested party or any other person—(A) withholds information that

has been requested by [Commerce]; (B) fails to provide such information by the

deadlines for submission of the information . . . ; (C) significantly impedes a proceeding

under this subtitle, or (D) provides such information but the information cannot be

verified as provided in section 1677m(i) of this subtitle."  19 U.S.C. § 1677e(a).

 In the sixth review, Commerce based its resort to facts otherwise available on the

"withholds information" and "significantly impedes a proceeding" criteria of 19 U.S.C.

§ 1677e(a)(2)(A) and (2)(C), respectively.  Commerce stated as follows: ". . . [W]e

continue to find that the GOC withheld necessary information that was requested of it,

and thus, Commerce must continue to rely on facts otherwise available in these final

results, pursuant to section 776(a)(2)(A) and (2)(C) [19 U.S.C. § 1677e(a)(2)(A) and

(2)(C)] of the Act."  Final Decision Mem. 23.  "By refusing to provide this information,

the GOC impeded Commerce's ability to conduct its investigation of this program."  *Id.*

at 22.  Commerce also invoked the "adverse inference" provision of 19 U.S.C.

§ 1677e(b), under which Commerce, in selecting from the facts otherwise available, may

use an inference adverse to the interests of a party that fails to cooperate by not acting to

the best of its ability to comply with its request for information.  *Id.* at 23 ("Moreover,

we determine that the GOC failed to cooperate by not acting to the best of its ability to

comply with our requests for required information.").

Commerce used an inference adverse to Yama even though Yama was not a

party Commerce found to have failed to cooperate.  The Tariff Act, in 19 U.S.C.

§ 1677e(b), authorizes Commerce, in choosing from among facts otherwise available, to

use an inference that is adverse to a party that failed to cooperate in the proceeding by

not acting to the best of its ability to comply with an agency's request for information.

Regardless, the Court of Appeals for the Federal Circuit ("Court of Appeals") has

recognized circumstances in which Commerce may use an adverse inference in a

countervailing duty proceeding, in response to non-cooperation by a national

government with information bearing on the subsidy in question, even if the result is a

collateral adverse effect upon a cooperating party.  *See Fine Furniture (Shanghai) Ltd. v.*

*United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) ("*Fine Furniture*") ("[A] remedy that

collaterally reaches Fine Furniture has the potential to encourage the government of

China to cooperate so as not to hurt its overall industry.").

Commerce relied upon *Fine Furniture* to support its use of facts otherwise

available with an adverse inference.  Final Decision Mem. 23–24.  But the facts of *Fine*

*Furniture* are not analogous to those presented here.  In *Fine Furniture*, the cooperative

respondent provided the price at which it purchased electricity, but the PRC

government failed to provide requested information on how electricity prices were

calculated, which was necessary to the Department's determining whether electricity

was provided according to market principles or on non-market terms that amounted to

a countervailable subsidy.  *See Fine Furniture*, 748 F.3d at 1368.  Due to the resulting gap

in the record, Commerce used AFA to determine that electricity was provided as a

specific financial contribution and to construct a benchmark price for electricity for

comparison with the rate paid by the cooperating respondent.  *Id*.  The Court of

Appeals recognized that "[b]ecause the government of China did not provide the

requested information, Commerce was forced to substitute for the missing information

and did so in accordance with 19 U.S.C. § 1677e(b)."  *Id*. at 1372.  The Court of Appeals

noted this important qualification: "Commerce did not apply adverse inferences to

substitute for any information that was actually submitted by the cooperating

respondents, such as the actual rate Fine Furniture reported paying for electricity.

Commerce used this rate to determine the amount of benefit that Fine Furniture

received under the Electricity Program." *Id*.  As this Court has stated in the context of

governmental non-cooperation in a countervailing duty proceeding, "Commerce may

apply AFA even if the collateral effect is to 'adversely impact a cooperating

party.' . . . Commerce, however, should 'seek to avoid such impact if relevant

information exists elsewhere on the record.'" *Changzhou Trina Solar Energy Co. v. United

States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018) (quoting *Archer Daniels Midland

Co. v. United States*, 37 CIT 760, 768–69, 917 F. Supp. 2d 1331, 1342 (2013)).  "Under

19 U.S.C. § 1677e(b) Commerce may use AFA to choose among facts of record, but the

choice must fill in the information that is actually missing."  *Id.* at __, 352 F. Supp.

at 1327.

In the sixth review, Commerce used facts otherwise available and adverse

inferences in place of probative record evidence that bore directly on the issue the

statute called upon Commerce to decide, which was whether an authority provided a

financial contribution "to a person and a benefit is thereby conferred."  19 U.S.C.

§ 1677(5)(B).  The record contained evidence supporting a finding that Yama did not

benefit from the EBCP.  This included Yama's statement that its customers did not use

the program, Yama First Supplemental Questionnaire Response 10 (Apr. 9, 2018), P.R.

Doc. 34; declarations from Yama's U.S. customers stating that they did not use the

program, Final Decision Mem. 22 (referencing these declarations); and the PRC

government's cross-referencing Yama's customer list against EX-IM Bank records and

reporting its having found none of Yama's customers in the records of the EBCP, GOC

First Supplemental Questionnaire Response 65–67 (Apr. 23, 2018), P.R. Doc. 35–37

("GOC First Supplemental Questionnaire Response"). Commerce disregarded this

evidence, explaining as follows:

> Our complete understanding of the operation of this program is a
> prerequisite to our reliance on the information provided by the company
> respondents regarding non-use.  Therefore, without the necessary
> information that we requested from the GOC, the information provided
> by the company respondents is incomplete for reaching a determination of
> non-use.  Accordingly, information regarding the operation of this
> program and the respondents' usage would come from the GOC.
> Commerce considered all the information on the record of this
> proceeding, including the incomplete statements of non-use provided by
> Yama.  As explained above and in the *Preliminary Results*, we are unable to
> rely on the information provided by Yama because Commerce lacks a
> complete and reliable understanding of the program.

Final Decision Mem. 23.  Commerce also concluded that the information it lacked

rendered the information Yama provided "unverifiable because, without a complete

understanding of the operation of the program, which could only be achieved through a

complete response by the GOC to our questions on this program, verification of these

customer's certifications of non-use would be meaningless."  *Id.* at 22.  Commerce

described what it considered to be the necessary information in this way: "information

pertaining to the 2013 revisions to the program, a list of all third-party banks involved

in the disbursement/settlement of export buyer's credits, and a list of all

partner/correspondent banks involved in disbursement of funds under this program[]."

*Id.*

During the review, the first questions to the Chinese government relating to the

EBCP were in the Department's March 23, 2018 first supplemental questionnaire.

*See* GOC First Supplemental Questionnaire (Mar. 23, 2018), P.R. Doc. 29 (the

Department's questionnaire); GOC First Supplemental Questionnaire Response 64–67

(the PRC's answers).  The instructions stated: "You must answer the below listed

questions regarding Export Buyer's Credits provided to **all U.S.** customers of the

mandatory respondents . . . during the POR."  GOC First Supplemental Questionnaire

Response 64 (emphasis in original).  Question 6 in this questionnaire asked the

government to "[p]rovide a list of all partner/correspondent banks involved in the

disbursement of funds" under the EBCP, to which the GOC replied "[n]ot applicable,"

as ". . . none of [Yama]'s US customers used the Export Buyer's Credits during the

POR."  *Id.* at 65–66.  Based on the Chinese government's stated position that Yama's

customers were not provided credits under the EBCP, this response does not constitute

a failure to cooperate.

In a second supplemental questionnaire dated June 21, 2018, Commerce asked

the Chinese government in question 16 to "[p]rovide the original and English

translation of the 2013 revisions to the Administrative Measures of Export Buyer's

Credits of the Ex-Im Bank of China."  GOC Second Supplemental Questionnaire 5

(June 21, 2018), P.R. Doc. 40 ("GOC Second Supplemental Questionnaire").  The PRC

government did not provide the 2013 revisions in response to question 16.  Instead, it

responded that "[t]he document requested is not available and can not be submitted.

We provide a copy of the Annual Report of 2016 of Ex-Im Bank of China at Exhibit

Sup2.Exhibit III.16."  GOC Second Supplemental Questionnaire Response 49 (July 12,

2018), P.R. Doc. 44–47 ("GOC Second Supplemental Questionnaire Response").  Because

the response did not provide any explanation as to why the document was not

available, the response is evidence of a failure by the Chinese government to cooperate.

In question 17, the supplemental questionnaire also directed: "In addition,

although you maintain on pages 65 - 67 that Yama's U.S. customers did not use the

Export Buyer's Credits from China Ex-Im Bank, as requested in the questionnaire,

please provide the following information: . . . Provide a list of all partner/correspondent

banks involved in disbursement of funds under the Export Buyer's Credit Program."

GOC Second Supplemental Questionnaire 5.  The Chinese government replied that it

confirmed that none of Yama's U.S. customers appear on the records of the Ex-Im Bank

and thus, "there were no relevant disbursements of funds in the [P]OR from *any* bank."

GOC Second Supplemental Questionnaire Response 49–50 (emphasis added).  The PRC

government appears to have misinterpreted the question, which is reasonably

interpreted to seek the identification of banks that were involved in any disbursements

of EBCP funds in partnership or correspondence with the Export Import Bank.

Nevertheless, a review of the entire record reveals that Commerce was not lacking

information on the issue presented by question 17.  To the contrary, the record of the

review included the PRC government's response to a supplemental questionnaire in

another proceeding.  *See* GOC First Supplemental Questionnaire Response 65.  This

submission clarifies that only the Ex-Im Bank makes disbursements under the EBCP

and that the role of private banks is limited to the "settlement" of funds, a process

described as involving the crediting and debiting of funds disbursed by the Ex-Im

Bank.[5]

---

[5] The response states as follows:

> The Ex-Im Bank has confirmed to the GOC that, when the conditions or
> milestones are met, the Ex-Im Bank will disburse the funds . . . .  [I]n order
> to make a disbursement, the Ex-Im bank lending contract requires the
> buyer (importer) and seller (exporter) to open accounts with either the Ex-
> Im Bank or one of its partner banks.  While these accounts are typically
> opened at the Ex-Im Bank, sometimes a customer prefers another bank
> (e.g., the Bank of China) which is more accessible than an account with the

(continued. . . .)

Thus, according to record evidence, Commerce erred, in two respects, in

concluding that it lacked requested information comprised of "a list of all third-party

banks involved in the disbursement/settlement of export buyer's credits, and a list of all

partner/correspondent banks involved in disbursement of funds under this program,"

Final Decision Mem. 22.  First, Commerce was on notice from record evidence that only

the Ex-Im Bank disbursed EBCP funds and that private banks did not.  Second, the

questions Commerce placed before the Chinese government pertained only to the

disbursement of funds.  Commerce did not ask for a list of banks involved in the

---

Ex-Im Bank.  The loan agreement also stipulates that the borrower
(generally the importer/customer) must grant the Ex-Im Bank
authorization to conduct transactions in the account opened specifically
for this financing.  After all conditions for disbursement are met, the
Ex-Im Bank will disburse the funds according to the lending agreement.
The funds are first sent from the Ex-Im Bank to the borrower's (importer)
account at the Ex-Im Bank (or other approved partner bank).  The Ex-Im
Bank then sends the funds from the borrower's (importer) account to the
seller's (exporter) bank account.

GOC First Supplemental Questionnaire Response Sup1 Ex. D-1 (*GOC 7th Supplemental
Response* in the *Countervailing Duty Investigation of Certain Amorphous Silica Fabric from
the People's Republic of China* 4–5 (Sept. 6, 2016)) (Apr. 23, 2018), P.R. Docs. 35–37 ("GOC
First Supplemental Questionnaire Response"); *see also id.* at Sup1 Ex. D-3 (Detailed
Implementation Rules Governing Export Buyers' Credit of the Export-Import Bank of
China 2 (Sept. 11, 1995)) (distinguishing between the "disbursing bank," i.e., the Ex-Im
Bank, and the "settlement bank," as follows: "After the Export-Import Bank of China
receives the notice, the business department shall verify and debit the borrower's loan
account, notify the borrower on the account entry date, disburse the funds to the
settlement bank, and notify the settlement bank . . . .").

settlement of funds.  *See* GOC First Supplemental Questionnaire Response 65

("6. Provide a list of all partner/correspondent banks involved in *disbursement* of funds

under the Export Buyer's Credit Program)" (emphasis added).  Commerce may not

resort to its authority under 19 U.S.C. § 1677e based on an alleged failure to provide

information it never requested.  Commerce, therefore, was unjustified, and

unsupported by record evidence, in concluding that the information it requested, and

did not receive, from the PRC government regarding "disbursement" and "settlement"

of EBCP funds prevented it from relying upon or verifying the information Yama

provided.

       In sum, Commerce had a basis in record evidence on which to conclude

that the Chinese government failed to cooperate by not providing information,

but only regarding information on the 2013 revisions to the EBCP.  But record

evidence does not establish a relationship between this missing information and

the question of whether Commerce could rely upon or verify Yama's and the

Chinese government's submitted information constituting record evidence that

Yama did not benefit from this program.  The only explanation Commerce

provided as to why it sought the 2013 revisions was its desire to ascertain

whether a two-million-dollar threshold applies to loans under the program.  *See*

Preliminary Results Mem. 11 ("Information obtained in a prior CVD proceeding

indicates that the GOC revised the Export Buyer's Credit program in 2013 to

eliminate the requirement that loans under the program be a minimum of two

million U.S. dollars."); Final Decision Mem. 22 ("[T]he 2013 revisions may have

eliminated the two million U.S. dollar contract minimum associated with this

lending program."). The record shows no relationship between the existence of,

or lack of, that loan threshold and the issue of whether Yama's customers used

the EBCP to Yama's benefit.

The Final Decision Memorandum states that when a government, rather

than a respondent, fails to cooperate in a countervailing duty proceeding, "[t]he

respondent company has the opportunity to demonstrate that it did not use, or

benefit from, the program at issue." Final Decision Mem. 27. Here, the

Department's unsupported conclusions that "Commerce can no longer rely on

declarations of non-use without a complete response by the GOC to Commerce's

questionnaires," *id.* at 22, and "[o]ur complete understanding of the operation of

this program is a prerequisite to our reliance on the information provided by the

company respondents regarding non-use," *id.* at 23, rendered that opportunity a

nullity for Yama. According to the Final Decision Memorandum, "Commerce

considered all the information on the record of this proceeding, including the

incomplete statements of non-use provided by Yama." *Id.* The record refutes

any contention that Commerce considered the record evidence Yama and the

Chinese government presented relating to the question of a benefit to Yama from

the EBCP.  The only reason Commerce offered as to why Yama's evidence was

incomplete was a non-sequitur: "we are unable to rely on the information

provided by Yama because Commerce lacks a complete and reliable

understanding of the program."[6]  *Id*.  There was no evidence on the record of the

review to support a finding that any U.S. customer of Yama used the EBCP, and

the record contained evidence refuting any such finding.  On remand, Commerce

must consider the record evidence fairly and impartially and reach a new

determination on whether Yama benefitted from the EBCP.

### D. Provision of Synthetic Yarn and Caustic Soda for Less-than-Adequate Remuneration

Commerce attributed to Yama participation in what it termed "programs" that it

identified as "Provision of Synthetic Yarn for LTAR" and "Provision of Caustic Soda for

LTAR."  Commerce reached this result by using facts otherwise available and adverse

inferences under 19 U.S.C. § 1677e(a) and (b), respectively, concluding that the

---

[6] This is the latest in a series of cases involving the EBCP in which Commerce claimed that its lack of understanding of the EBCP program prevented it from considering or verifying record evidence tending to establish non-use of the program. *See Clearon Corp. v. United States*, 44 CIT __, ___, 474 F. Supp. 3d 1339, 1350–51 nn. 10–12 (2020) (listing cases).

government of the PRC did not provide requested information and was uncooperative

in not acting to the best of its ability in responding to certain of the Department's

information requests.

As discussed further below, Yama challenges the Department's use of facts

otherwise available with adverse inferences with respect to the synthetic yarn and

caustic soda inputs, including the Department's drawing an adverse inference that the

"specificity" requirement in the statute was satisfied.  Pl.'s Br. 36–42.  In the alternative,

Yama claims that Commerce erred in adding ocean freight and value-added tax in

determining the adequacy of remuneration.  *Id.* at 42–47.  Because it concludes that

Commerce erred in its application of facts otherwise available and adverse inferences

with respect to these two inputs, the court does not reach Yama's alternative claim.

According to the Final Decision Memorandum, Commerce requested that the

government of the PRC provide the following items of information for each of the two

production inputs:

a. The total number of producers.

b. The total volume and value of Chinese domestic <u>consumption</u> of {input} and
the total volume and value of Chinese domestic <u>production</u> of {input}.

c. The percentage of domestic consumption accounted for by domestic
production.

d. The total volume and value of imports of {input}.

e. The percentage of total volume and (separately) value of domestic production that is accounted for by companies in which the Government maintains an ownership or management interest, either directly or through other Government entities, including a list of the companies that meet these criteria.

f. A discussion of what laws, plans or policies address the pricing of the input, the levels of production of the input, the importation or exportation of the input, or the development of the input capacity. Please state which, if any, central and subcentral level industrial policies pertain to the input industry.

Final Decision Mem. 10 (citing GOC First Supplemental Questionnaire 3).  In

responding to this request for both synthetic yarn and caustic soda, the PRC began by

stating that "[i]n the GOC's view, there is no program such that synthetic yarn [or

caustic soda] is provided for LTAR to the respondent" and continued, "[n]evertheless to

fully cooperate in this investigation, the GOC provides responses to the Input Producer

Appendix below."  GOC First Supplemental Questionnaire Response 16, 38.

The Chinese government provided answers in response to questions concerning

production inputs including: (1) the total number of enterprises producing and the total

value of production of each of these input supplies; (2) the total volume and value of

domestic consumption and production; and (3) the percentages of domestic

consumption satisfied by domestic production of these input supplies, by both volume

and value.  *Id*. at 32–33, 53–54.  The government of China also noted that no supplier of

synthetic yarn or caustic soda was a state-owned enterprise or otherwise majority-

owned by the government.  *Id.* at 17, 38.  In several responses to the questionnaire, the

Chinese government reiterated its initial statement indicating that no program provided

Yama with synthetic yarn or caustic soda for LTAR.  These reiterations included: "[t]he

GOC notes that synthetic yarn was not subject to any price control during the POR," *id*.

at 28, "[t]he GOC does not regulate the pricing of synthetic yarn.  Rather, the provision

of synthetic yarn is dictated by market forces and not by any plan that sets the levels of

production of synthetic yarn or the development of synthetic yarn," *id*. at 34, and "[t]he

GOC does not impose any limitations on the use of synthetic yarn and producers of

synthetic yarn are free to sell their product to any purchaser and at any price," *id*. at 35.

The government provided identical responses for caustic soda.  *Id*. at 49, 55–56.

Regarding the request for information on "individual owners, members of the

board of directors, or senior managers who were Government or CCP officials during

the POI" the GOC responded by stating that there was no central database with this

information and that they could not disclose personal information under the Regulation

on Disclosure of Government Information.  *Id*. at 30 (synthetic yarn), *id*. at 51 (caustic

soda).  The government then stated that Commerce "should collect this information

through the respondents, via their suppliers directly."  *Id*.

Commerce issued a second supplemental questionnaire "requesting further

information regarding the two inputs, including that the GOC provide a list with the

number of producers in which it maintains an ownership or management interest."

Final Decision Mem. 10; *see also* GOC Second Supplemental Questionnaire.  In that

questionnaire, Commerce requested that the PRC government provide full ownership

information and documentation for each of Yama's private suppliers of these two

inputs, "identify any individual owners, members of the board of directors, or senior

managers" of these suppliers or any entity in their ownership structure who, during the

POR, "were government or Chinese Communist Party (CCP) officials," and "explain if

[each] company had a CCP organization during the POR."  GOC Second Supplemental

Questionnaire 2.

　　　　Regarding the request for full ownership information, the GOC's second

supplemental response stated that "these raw material providers concerned are not

state-owned or state controlled enterprises," GOC Second Supplemental Questionnaire

Response 41, and that Commerce should reach out to Yama for "information about

these shareholders including their ultimate owners," should there be additional

inquiries.  *Id*.  The government of China also stated, further, that the National Bureau of

Statistics of China does not collect certain of the information requested and that

Article 25 of the Statistics Law of China prohibited dissemination of other information

regarding suppliers, including those in which the GOC had a less-than-controlling

interest.  *Id*. at 42–43.  Much like it did in response to the first supplemental

questionnaire, on the identification of government or CCP officials involved with

Yama's private suppliers, the government replied, "the requested information and

documents are confidential and commercial information in China, which is not

available to the public.  Therefore, the GOC is unable to obtain the information

requested."  *Id*. at 41.

Commerce rejected the PRC government's explanations for not providing the

requested information on levels of government ownership and CCP membership in the

input suppliers.  Regarding the ownership information, Commerce stated that:

> Information on the record indicates that in prior CVD proceedings,
> Commerce was able to confirm at verification that the GOC maintains two
> databases at the State Administration of Industry and Commerce: one is
> the business registration database, showing the most up-to-date company
> information; a second system, 'ARCHIVE,' houses electronic copies of
> documents such as business licenses, annual reports, capital verification
> reports, etc.

Final Decision Mem. 11.  Commerce added that "[t]herefore, we find that the GOC has

an electronic system available to it to gather the industry-specific information

Commerce requested, but elected not to assist Commerce in obtaining necessary

information for this proceeding."  *Id.*  Regarding possible CCP presence in the input

suppliers, Commerce noted that the PRC government replied by providing "a long

narrative explanation of the role of the CCP" but "explained that there is 'no central

informational database to search for the requested information' and directed Commerce

to obtain this information directly from Yama's privately-owned input suppliers."  *Id*.

at 12 (citation omitted).  Rejecting this explanation, Commerce stated that "[a]s AFA, we

find that CCP officials are present in each of Yama's privately-owned input suppliers as

individual owners, managers and members of the boards of directors, and that this

gives the CCP, as the government, meaningful control over the companies and their

resources."  *Id*.

Concluding that the Chinese government failed to cooperate in answering its

inquiries, Commerce drew the adverse inference "that Chinese prices from transactions

involving Chinese buyers and sellers are significantly distorted by the involvement of

the GOC."  *Id.* at 11 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Int'l Trade

Admin. Nov. 25, 1998).  It also adopted adverse inferences that Yama's private suppliers

of both inputs were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *Id.*

Commerce then drew the further adverse inferences that Yama received from these

authorities financial contributions from a program or programs that provided financial

contributions in the form of receiving these two inputs for less-than-adequate

remuneration.  *Id.* at 13.  Commerce used other adverse inferences in deeming each of

these "programs" to have met the specificity requirement set forth in the statute,

19 U.S.C. § 1677(5) and (5A).  *Id.*  Commerce proceeded to determine what it considered

to be adequate remuneration and calculated subsidy rates for these two inputs, 10.45%

for synthetic yarn and 0.26% for caustic soda, for inclusion in the total net

countervailable duty subsidy rate of 23.70%.  *Final Results*, 84 Fed. Reg at 11,052; *see*

Final Decision Mem. 4.

Yama brings three specific claims in challenging the Department's inclusion of

the subsidy rates for synthetic yarn and caustic soda.  It claims, first, that Commerce

unlawfully resorted to facts otherwise available and an adverse inference in

determining that all eight of the private producers of synthetic yarn, and the sole

producer of caustic soda, that supplied it these inputs during the POR were

"authorities" within the meaning of 19 U.S.C. § 1677(5).  Pl.'s Br. 36.  Second, Yama

claims that any subsidy that may have been provided to Yama with respect to these two

production inputs was not "specific" within the meaning of 19 U.S.C. § 1677(5) and (5A)

and, therefore, was not countervailable.  *Id*. at 42.  Third, in the alternative, Yama

challenges the Department's calculation of the individual subsidy rates, i.e., 10.45% for

synthetic yarn and 0.26% for caustic soda, arguing that Commerce erred when it

included ocean freight and value-added tax in the calculation of the adequacy of

renumeration.  *Id.* at 42–47.

As discussed below, the court does not sustain the Department's decision to use

adverse inferences to deem Yama to have received a financial benefit from a program or

programs that met the specificity requirement of the Tariff Act, 19 U.S.C. § 1677(5A) in

providing synthetic yarn and caustic soda for less-than-adequate remuneration.

Commerce reached these adverse inferences despite uncontradicted record evidence,

consisting of the aforementioned questionnaire responses of the Chinese government,

that no such program or programs existed.  Moreover, Commerce did not present a

convincing reason for concluding that the specificity requirement in the Tariff Act,

19 U.S.C. § 1677(5) and (5A), was met.  The court, therefore, does not address Yama's

claim that the Department's adverse inference deeming the suppliers to be authorities

was unlawful or its claim that the subsidy rates relating to the two inputs improperly

included value-added taxes and ocean freight.

> Under the Tariff Act, a countervailable subsidy potentially exists where an

"authority," i.e., a "government of a country or any public entity within the territory of

the country," 19 U.S.C. § 1677(5)(B), confers a benefit upon a person by providing goods

"for less than adequate remuneration," *id.* § 1677(5)(E)(iv).  Here, the court may

presume, *arguendo*, that the Department's adopting as an adverse inference that Yama's

synthetic yarn and caustic soda suppliers were "authorities" within the meaning of

19 U.S.C. § 1677(5)(B) was supported by the Chinese government's failure to cooperate

by not acting to the best of its ability to provide full information on the ownership of

input suppliers and the possible presence of CCP members in positions of leadership on

those suppliers.  Commerce drew the adverse inference that "CCP officials are present

in each of Yama's privately-owned input suppliers as individual owners, managers and

members of the boards of directors, and that this gives the CCP, as the government,

meaningful control over the companies and their resources."  Final Decision Mem. 12.

But even if the suppliers are presumed, *arguendo*, to be authorities as a result of

government control, it does not follow that government programs necessarily existed to

provide these inputs at less-than-adequate remuneration.  And even if it were

presumed that a benefit is conferred, a subsidy will not be countervailable unless it is

"specific" as described in the statute.  *See* 19 U.S.C. § 1677(5A).  Here, the Department's

adverse inferences that a governmental program or programs existed during the POR

that provided Yama with synthetic yarn and caustic soda for less-than-adequate

remuneration, and that any such programs met the specificity requirement of the

statute, are not supported on this record or on the Department's reasoning.

Commerce grounded its specificity determination solely in its prior practices

rather than the record of this review.  The Department's analysis of this issue in the

Final Decision Memorandum is as follows: "When the government fails to provide

requested information concerning alleged subsidy programs, as AFA, we typically find

that a financial contribution exists under the alleged program and the program is

specific."  Final Decision Mem. 13.  The Preliminary Decision Memorandum contains no

further analysis on this issue.  *See* Preliminary Results Mem. 7–10, 26–30.

Neither the Preliminary nor Final Decision Memorandum fully addresses the

responses the Chinese government provided to the first supplemental questionnaire

regarding synthetic yarn and caustic soda, for "a discussion of what laws, plans or

policies address the pricing of [the input], the levels of production of [the input], the

importation or exportation of [the input], or the development of [the input] capacity."

Final Decision Mem. 10 (quoting GOC First Supplemental Questionnaire 4, 7).

Commerce asked, further, that the PRC government "please state which, if any, central

and subcentral level industrial policies pertain to the input industry." *Id*.  As noted

previously, the PRC government provided responses to these inquiries indicating that

no program existed that provided either synthetic yarn or caustic soda for less-than-

adequate remuneration in China.  GOC First Supplemental Questionnaire Response 16,

38.  The government responded, further, that "[t]he GOC does not regulate the pricing

of synthetic yarn [or caustic soda]." *Id*. at 34 (synthetic yarn), *id*. at 55 (caustic soda).[7]  It

added that "[r]ather, the provision of synthetic yarn is dictated by market forces and

not by any plan that sets the levels of production of synthetic yarn or the development

of synthetic yarn [or caustic soda]," *id*. at 34 (synthetic yarn); *id.* at 55 (caustic soda).

[7] The GOC attached a "Pricing Law" as an exhibit to this questionnaire response
specifying that market-set prices are the default and allowing for government-
controlled prices in situations not relevant here.  GOC First Supplemental
Questionnaire Response 34 Ex. II.E.7.

These responses constitute uncontradicted record evidence that the program or

programs providing the two inputs at LTAR that Commerce posited, as an adverse

inference, to have been in effect during the POR, to have benefitted Yama, and to have

met the specificity requirement, did not exist.

        Commerce acted unlawfully in directing some of its adverse inferences to gaps in

the record where none were shown.  Here, Commerce did not question the responses

the government of China gave to the Department's first supplemental questionnaire on

the non-existence of a program to subsidize particular users of synthetic yarn or caustic

soda.  Commerce placed no evidence on the record indicating that the PRC

government's assertions were incorrect.  Commerce did not pose additional questions

regarding the existence of programs to supply Yama synthetic yarn or caustic soda at

LTAR in its second supplemental questionnaire, which was concerned instead with

potential CCP control and the level of government ownership of synthetic yarn and

caustic soda suppliers.

        The Department's failure to mention in the Final Decision Memorandum the

record evidence that no programs to provide synthetic yarn or caustic soda at LTAR

existed in China during the POR is a critical, and misleading, omission from the

analysis Commerce offered to support its decision to impose upon Yama a

countervailing duty for the two inputs.  The Department's unsatisfactory treatment of

the issue of specificity ignores a fundamental component of the countervailing duty law

that is designed to ensure that countervailing duties are not imposed where widespread

availability and use of a subsidy spreads a benefit throughout an economy.  *See*

*Changzhou Trina Solar Energy Co.,* 42 CIT at __, 352 F. Supp. 3d at 1330 (citing Uruguay

Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316,

vol. 1, at 930–31 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242).  Thus, the

Department's use of facts otherwise available and adverse inferences to determine that

programs providing synthetic yarn and caustic soda for LTAR existed during the POR,

and were specific as required under 19 U.S.C. § 1677(5) and (5A), is unsupported by the

evidence on the record.

        The court does not suggest that Commerce would lack authority, in an

appropriate circumstance, to use facts otherwise available or an adverse inference in

fulfilling the statutory prerequisites stemming from the specificity requirement of

19 U.S.C. § 1677(5) and (5A).  But here, Commerce drew its adverse inferences relating

to a supposed program or programs involving the two inputs, and the supposed

specificity of those programs, based on its finding that the PRC government failed to

cooperate in responding to inquiries directed to another issue, which was government

control of the suppliers of the inputs, i.e., the issue of whether those suppliers were

"authorities."  In doing so, Commerce ignored relevant and uncontradicted evidence.

Particularly where, as here, the injurious effect of the adverse inference is borne by a

cooperative party, not the non-cooperating government, "Commerce must tread

carefully." *Yama Ribbons and Bows Co. v. United States*, 43 CIT __, __, 419 F. Supp. 3d

1341, 1347 (2019).  Commerce conducted no analysis to support its adverse inferences of

a government program or programs benefitting a limited or preferred group of

purchasers of yarn or caustic soda.  As a result, Commerce failed to justify its use of its

authority under 19 U.S.C. § 1677e(b) to reach an adverse inference, prejudicial to Yama,

of the existence of a subsidy program or programs that would meet the specificity

limitations of the Tariff Act.

Defendant argues that Commerce was justified in inferring specificity as

"adverse facts available" on the basis of the PRC government's failure to respond to the

Department's request that the government provide "a list of industries in China that

purchase synthetic yarn and caustic soda, identify the classification scheme the

government normally relies on to define industries, and classify companies within an

industry."  Def.'s Br. 34.  Defendant-intervenor argues that "[p]recisely because

Commerce had to use AFA, it was reasonable for Commerce to determine as AFA that

the provision of synthetic yarn and caustic soda was specific."  Def.-Int.'s Br. 22.  The

court disagrees with these arguments, as they do not withstand analysis of the nature of

the Department's inquiry and the evidence consisting of the responses of the PRC

government, considered on the whole.

The Chinese government's first response to the request defendant identifies was

that "[t]he GOC does not impose any limitations on the use of synthetic yarn and

producers of synthetic yarn are free to sell their product to any purchaser and at any

price.  Similarly, purchasers of synthetic yarn are free to source their product from any

producer, domestic or foreign" and that "[a]s a general matter, synthetic yarn has a

wide range of uses, including but not limited to use in the narrow ribbon industry."

GOC First Supplemental Questionnaire Response 35.  The same response was provided

with respect to caustic soda.  *Id.* at 55–56.  When Commerce repeated its inquiry in its

supplemental questionnaire, the Chinese government responded, as to both inputs, that

"[t]he GOC does not maintain such information, as the industry classification in

question is not used or maintained as required."  GOC Second Supplemental

Questionnaire Response 44.

The court agrees with defendant's argument that the government of the PRC did

not provide certain information Commerce sought.  But the conclusion of a failure on

the part of the government to cooperate as to this specific inquiry is not supported on

this record.  Commerce did not place evidence on this record that the information it

sought on customers of the synthetic yarn and caustic soda industries and the related

industrial classifications was maintained and available to be provided, contrary to the

claim of unavailability made by the PRC government.  Moreover, even if it were

assumed, *arguendo*, that some failure to cooperate occurred as to this inquiry,

defendant's argument still would be unconvincing.  Other responses by the PRC

government introduced uncontradicted evidence that no programs existed upon which

a relevant specificity analysis could have been conducted, such that there was no "gap"

to be filled by facts otherwise available and adverse inferences.

Defendant argues, further, that Yama's claim that the specificity element of the

statute was not met "is directly contrary to the rule that '{w}here the foreign

government fails to act to the best of its ability, Commerce will usually find that the

government has provided a financial contribution to a specific industry.'"  Def.'s Br. 35

(quoting *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297

(2010)).  Defendant also relies on *RZBC Grp. Shareholding Co., Ltd. v. United States*, 39 CIT

__, __, 100 F. Supp. 3d 1288, 1299–1301 (2015) for the principle that Commerce may infer

specificity to an industry when the government of the exporting country fails to

cooperate.  Neither case speaks to the problem this case poses, which is the

Department's ignoring, as well as failing to mention in its Final Decision Memorandum,

uncontradicted record evidence that the government programs Commerce inferred to

exist to the benefit of Yama, and to have had specificity, did not exist.

In summary, Commerce acted unlawfully in deciding to include subsidy rates related to Yama's synthetic yarn and caustic soda inputs without considering all relevant record evidence, in particular the uncontradicted record evidence that no programs existed during the POR that provided these inputs at LTAR. Commerce, in addition, did not conduct an analysis sufficient to support an adverse inference that any such programs would have met the specificity requirement of the Tariff Act so as to result in countervailable subsidies.

### III.  CONCLUSION AND ORDER

The court remands the Final Results to Commerce for reconsideration of the Department's decision to include a subsidy rate for the EBCP in the total subsidy rate applied to Yama. On remand, Commerce must make the determination the statute requires it to make, i.e., whether Yama was conferred a benefit from the EBCP. Commerce must make this determination based upon a full and fair consideration of the record evidence.

Commerce also must reconsider its decision to include in Yama's overall subsidy rate individual subsidy rates related to Yama's synthetic yarn and caustic soda inputs and take the corrective action that is necessary to fulfill the requirements of the statute. Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Motion for Judgment on the Agency Record of Plaintiff Yama Ribbons and Bows Co. (Aug. 9, 2019), ECF No. 25, be, and hereby is, granted; and it is further

**ORDERED** that Commerce shall correct the errors identified herein and submit a new determination upon remand ("Remand Redetermination") that complies fully with this Opinion and Order; it is further

**ORDERED** that Commerce will submit its Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that any comments by plaintiff Yama Ribbons and Bows Co. and defendant-intervenor Berwick Offray LLC on the Remand Redetermination must be filed with the court no later than 30 days after the filing of the Remand Redetermination; and it is further

**ORDERED** that any response of defendant to any comments received must be filed no later than 15 days from the date on which the last comment is filed.

  /s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: April 30, 2021
    New York, New York