C-570-953
Remand Redetermination
**Public Document**
E&C/Office II:  TKS

**Final Results of Redetermination Pursuant to Court Remand**
**Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China**
*Yama Ribbons and Bows Co., v. United States*,
**Court No. 19-00047, Slip. Op. 21-50 (CIT April 30, 2021)**

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *Yama Ribbons and Bows Co., v. United States*, Court No. 19-00047, Slip. Op. 21-50 (CIT

April 30, 2021) (*Yama Ribbons*).  This action arises out of the final results in *Narrow Woven*

*Ribbons with Woven Selvedge from the People's Republic of China:  Final Results of*

*Countervailing Duty Administrative Review; 2016*, 84 FR 11052 (March 25, 2019) (*Final*

*Results*), and accompanying Issues and Decision Memorandum (IDM).  The Court remanded to

Commerce its findings that Yama Ribbons and Bows Co. (Yama) used and benefited from the

Export Buyer's Credit program (EBCP) and the Provision of Synthetic Yarn and Caustic Soda

for Less-Than-Adequate Remuneration (LTAR) and its inclusion of these subsidies in the overall

subsidy rate determined for Yama.  As discussed below, pursuant to *Yama Ribbons*, Commerce

has reconsidered its decision to apply adverse facts available (AFA) in evaluating use of the

EBCP and determines, under respectful protest, that the EBCP was not used by Yama based on

record information and statements by Yama and the Government of China (GOC) that none of

Yama's customers used the program during the period of review (POR).  Under respectful

protest, Commerce revised Yama's overall subsidy rate to exclude the 10.54 percent AFA

subsidy rate assigned to the EBCP.  Commerce also further considered the information on the

record regarding the Provision of Synthetic Yarn and Caustic Soda for LTAR programs and addressed the "specificity" requirement in the statute for them.  Upon further examination, Commerce finds that:  (1) the Provision of Synthetic Yarn and Caustic Soda for LTAR programs meet the specificity requirement of the statute and, therefore, are countervailable subsidies; and (2) Yama benefited from these programs during the POR.  Consequently, for the purposes of these final results of redetermination, Commerce continued to include the Provision of Synthetic Yarn and Caustic Soda for LTAR program subsidy rates (*i.e.*, 10.45 percent and 0.26 percent, respectively) in Yama's overall subsidy rate.

## II.    BACKGROUND

### A.  Export Buyer's Credit Program

On March 25, 2019, Commerce published its *Final Results* of the 2016 countervailing duty (CVD) review.[1]  In the *Final Results*, we found that the use of AFA was warranted in determining the countervailability of the EBCP because the GOC did not provide the requested information needed to allow Commerce to fully analyze this program and, thus, had not cooperated to the best of its ability in response to our information requests.[2]  We determined, as AFA, that the EBCP met the financial contribution and specificity requirements of the Tariff Act of 1930, as amended (the Act).[3]  Further, we determined that without the necessary information that we requested from the GOC, the information provided by Yama is incomplete for reaching a determination of non-use.[4]  Therefore, we determined as AFA that Yama used the EBCP and, consistent with our CVD AFA hierarchy, we selected the highest calculated rate for a similar

---

[1] *See Final Results* IDM.

[2] *Id.* at Comment 3; *see also Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review*; 2016 83 FR 50891 (October 10, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[3] *Id.*

[4] *Id*.

program as the AFA rate for this program (*i.e.*, 10.54 percent), in accordance with section 776(d) of the Act and our established practice.[5]

### B.  The Provision of Synthetic Yarn and Caustic Soda for LTAR

With regard to the Provision of Synthetic Yarn and Caustic Soda for LTAR programs, we lacked record information from the GOC to determine whether:  (1) the prices from transactions involving Chinese buyers and sellers were significantly distorted by the involvement of the GOC; and (2) the private companies which supplied Yama with synthetic yarn and caustic soda were "authorities" within the meaning of section 771(5)(B) of the Act.[6]

As a result, we determined as AFA that all of Yama's synthetic yarn and caustic soda suppliers were "authorities."[7]  Moreover, because we determined as AFA that the prices from transactions involving Chinese buyers and sellers were significantly distorted by the involvement of the GOC, we determined that prices from Yama's suppliers were not usable as benchmarks because they were prices charged by the providers of the goods at issue.  As a result, as AFA, we selected benchmarks for measuring the adequacy of the remuneration for synthetic yarn and caustic soda in accordance with 19 CFR 351.511(a) by using tier two benchmarks.[8]

Regarding financial contribution, we determined that because Yama reported that it purchased synthetic yarn from eight producers of synthetic yarn and from one producer of caustic soda during the POR and because of the GOC's failure to respond to Commerce's requested information regarding the companies that supplied Yama these inputs, in relying on AFA, Yama received financial contributions from these suppliers in the form of the provision of

---

[5] *See Final Results* IDM at Comment 3.
[6] *Id.* at Comment 1; *see also Preliminary Results* PDM at 7-10.
[7] *Id*.
[8] *Id.* at Comment 1; *see also Preliminary Results* PDM at 23-24.

a good, pursuant to section 771(5)(D)(iii) of the Act.[9]  Finally, to determine specificity, Commerce requested that the Chinese government provide a list of industries in China that purchase synthetic yarn and caustic soda, identify the classification scheme the government normally relies on to define industries, and classify companies within an industry.[10]  However, the Chinese government failed to respond to Commerce's request for information.[11]  Thus, we determined based on AFA that the GOC's provision of these inputs is specific within the meaning of section 771(5A)(D) of the Act.[12]  Accordingly, we determined that these programs confer a countervailable subsidy.

## III.  COURT'S REMAND OPINION AND ORDER

Yama challenged Commerce's findings that it used and benefited from the EBCP and Commerce's government authorities and specificity findings, based on AFA, for the Provision of Synthetic Yarn and Caustic Soda for LTAR programs in the *Final Results*.  On April 30, 2021, the Court remanded the *Final Results* to Commerce.

### A.  Export Buyers' Credit Program

Yama challenged Commerce's findings that it used and benefited from the EBCP and Commerce's government authorities and specificity findings, based on AFA, for the Provision of Synthetic Yarn and Caustic Soda for LTAR programs in the *Final Results*.  On April 30, 2021, the Court remanded the *Final Results* to Commerce.  Regarding the EBCP, the Court found that: (1) Commerce disregarded considerable record evidence that Yama did not benefit from the EBCP; (2) there was no evidence on the record of the review to support a finding that any of

---

[9] *Id.* at Comment 1; *see also Preliminary Results* PDM at 27 and 29.
[10] *See* Commerce's Letter, Additional Subsidy Questionnaire, dated March 23, 2018 (GOC Additional Questionnaire).
[11] *See* GOC's Letter, "Supplemental Questionnaire Response," dated April 20, 2018 (GOC's SQR).
[12] *See Preliminary Results* PDM at 26-27; *see also Final Results* IDM at 12-13.

Yama's U.S. customers used the EBCP; and (3) record evidence does not establish a relationship between the missing information regarding the 2013 revisions to the EBCP and whether Yama's customers used the EBCP program.[13] [14]  Thus, the Court remanded for Commerce to reconsider the record evidence fairly and impartially and reach a new determination on whether Yama benefitted from the EBCP during the POR.[15] Because the Court concluded that Commerce acted unlawfully in its use of facts otherwise available with an adverse inference regarding the EBCP, the Court did not reach Yama's alternative challenge to the 10.54 percent EBCP subsidy rate.[16]

### B.  The Provision of Synthetic Yarn and Caustic Soda for LTAR

Yama challenged three aspects of Commerce's final results with respect to the Provision of Synthetic Yarn and Caustic Soda for LTAR subsidies.  Yama challenged Commerce's resort to facts otherwise available and the use of an adverse inference in determining that the producers of synthetic yarn and the one producer of caustic soda that supplied these inputs to Yama during the POR were "authorities" within the meaning of 19 U.S.C. section 1677(5) (*i.e.*, section 771(5) of the Act).  Yama also challenged Commerce's specificity determination with respect to these inputs.  Further, Yama challenged Commerce's calculation of the subsidy rates for these LTARs, arguing that Commerce erred when it included ocean freight and value-added tax (VAT) in the calculation of the adequacy of remuneration.

The Court focused exclusively on Commerce's specificity determination, and in the process, also addressed the question of whether there was evidence that the subsidies at issue existed.  Because it found that Commerce erred in its application of facts available and the use of adverse inferences with respect to these two inputs, the Court did not address Yama's claims

---

[13] *See Yama Ribbons* at 20-21.
[14] *Id.* at 22.
[15] *Id*.
[16] *Id.* at 11.

concerning Commerce's determination that the suppliers were authorities within the meaning of the Act, nor whether the subsidy rates relating to the two inputs properly included VAT and ocean freight.

In particular, the Court found that Commerce did not present a convincing reason for concluding that, as AFA, the specificity requirement in sections 771(5) and (5A) of the Act was met for these programs;[17] Commerce conducted no analysis to support its adverse inferences that these programs benefitted a limited or preferred group (*i.e.*, were specific);[18] and Commerce's failure to address record evidence that these programs do not exist in China is a critical omission from its analysis supporting its decision to impose a duty on Yama for these two programs.[19] Moreover, while the Court agreed that the GOC failed to provide certain information Commerce sought regarding Commerce's specificity questions related to these programs, the Court held that the record did not support such a conclusion because the GOC claimed such information was not maintained or available to be provided and Commerce did not place evidence on the record to demonstrate such information it sought related to industrial classifications was maintained and available to be provided by the GOC.[20]  The Court held that there was no "gap" to be filled by facts otherwise available and adverse inferences regarding specificity because other responses by the GOC introduced "uncontradicted evidence that no programs existed upon which a relevant specificity analysis could have been conducted."[21]

Accordingly, the Court did not address Yama's challenges to Commerce's "authorities" determination, based on AFA, regarding these programs and inclusion of VAT and ocean freight

---

[17] *Id.* at 30.
[18] *Id.* at 35.
[19] *Id.* at 33.
[20] *Id.* at 36-37.
[21] *Id.* at 37.

in the subsidy rates for these two programs.[22]  However, the Court remanded the administrative

review to Commerce to reconsider its decision to include in Yama's overall subsidy rate the

Provision of Synthetic Yarn and Caustic Soda for LTAR subsidies and take the corrective action

that is necessary to fulfill the requirements of the statute.[23]

## IV.   REMAND PROCEEDING

On May 14, 2021, pursuant to 19 CFR 351.301(c)(4), we placed on the record of this

remand redetermination the following documentation from the 2015 administrative review:  (1)

the petitioner's submission regarding new subsidy allegations; and (2) Commerce's new subsidy

allegation decision memorandum.[24]  These are the documents and information upon which

Commerce relied to initiate an investigation of the Provision of Caustic Soda and Synthetic Yarn

for LTAR programs in the previous review.[25]  Pursuant to 19 CFR 351.102(b)(21)(iv) and

351.301(c)(4), we established a deadline for interested parties to submit factual information to

rebut, clarify, or correct the information contained in this memorandum.[26]  On June 2, 2021, we

received comments from Yama arguing that:  (1) 19 CFR 351.301(c)(4) does not authorize

Commerce to place new factual information (NFI) on the record within the confines of a lawsuit

and the Court did not instruct Commerce to do so; and (2) this NFI is neither warranted nor

---

[22] *Id.* at 30.

[23] *Id*. at 38.

[24] *See* Memorandum, "Placing Documents on the Record," dated May 14, 2021 at Attachment I:  Petitioner's Letter, "New Subsidy Allegations," dated February 7, 2017 (2015 NSA); and Attachment II:  Memorandum, "Decision Memorandum on New Subsidy Allegations," dated March 2, 2017 (NSA Decision Memo) (collectively, 2015 NSA Information).

[25] *See* 2015 NSA Information at Attachment 1:  NSA Decision Memo; *see also Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review*; 2015 82 FR 42296 (September 7, 2017) (*2015 Preliminary Results*), and accompanying PDM, unchanged in *Final Results of Countervailing Duty Administrative Review*; 2015 83 FR 11177 (March 14, 2018) (*2015 Final Results*), and accompanying IDM at Comment 1.

[26] *See* 2015 NSA Information.

necessary for Commerce to comply with the Court's mandate. Thus, Yama requested that Commerce remove this information from the record.[27] No other party filed comments.

## V.    ANALYSIS

### A.  Legal Framework:  Use of Facts Otherwise Available and Adverse Inferences

Sections 776(a)(1) and (2) of the Act provide that Commerce, subject to section 782(d) of the Act, shall apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Commerce's practice when selecting an adverse rate from among the possible sources of information is to ensure that the result is sufficiently adverse "so as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[28]  Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[29]

---

[27] *See* Yama's Letter, "Comments on New Documents Placed on the Record by Commerce on May 14, 2021," dated June 2, 2021.
[28] *See Notice of Final Determination of Sales at Less than Fair Value:  Static Random-Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).
[29] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 at 870 (1994) (SAA).

**B.  Export Buyer's Credit Program**

Consistent with *Yama Ribbons*, we have reconsidered our determination, based on the application of AFA, that Yama used and benefited from the EBCP during the POR.  We also considered the record evidence which Yama and the GOC provided regarding Yama's and its customers' non-use of the EBCP.  Upon reexamination of the record evidence, we have complied with the Court's ruling and now find that Yama did not use this program during the POR, under respectful protest.[30]  Our findings with respect to the financial contribution and specificity determinations made in the *Final Results* remain unchanged.[31]

Specifically, in accordance with the Court's remand order, we are relying on Yama and the GOC's statements on the record that none of Yama's customers used the program during the POR, as well as Yama's customers' declarations of non-use to determine that Yama did not use the EBCP during the POR, under respectful protest.[32]

**C.  The Provision of Synthetic Yarn and Caustic Soda for LTAR**

As discussed above, in the *Final Results*, we found that the use of AFA was warranted in determining the countervailability of the Provision of Synthetic Yarn and Caustic Soda for LTAR subsidies because the GOC did not provide the requested information needed to allow Commerce to fully analyze these subsidies and, thus, did not cooperate to the best of its ability in response to our information requests.  We determined as AFA that these subsidies met the financial contribution and specificity requirements of the Act.[33]  As an initial matter, we note that Commerce's longstanding practice is not to reexamine the specificity of a subsidy that it has

---

[30] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003).
[31] *See Final Results* IDM at 21-24.
[32] *Id.* at 22; *see also* Yama's Letter, "Response to Additional Questions Questionnaire," dated April 6, 2018 at 9-10 and Exhibit Add.-7; and GOC's SQR at 65.
[33] *See Final Results* IDM at Comments 1 and 3; *see also Preliminary Results* PDM.

previously found to be countervailable unless new evidence challenges such a finding.[34]  In the history of this proceeding, we previously found the Provision of Synthetic Yarn and Caustic Soda for LTAR programs to be countervailable in the 2015 administrative review based on AFA due to the lack of participation from the GOC.[35]  Because the countervailability of these programs was based on AFA in a prior review, we asked the GOC to provide necessary information regarding these programs in the 2016 review.[36]  Therefore, consistent with our normal practice, because the government again did not provide us with the necessary information, we determined in the final results, based on AFA, that these subsidies were specific within the meaning of the section 771(5A) of the Act.

We note that the Court acknowledges Commerce's authority, in the appropriate circumstances, to use facts otherwise available or an adverse inference in fulfilling the statutory prerequisites stemming from the specificity requirements of sections 771(5) and (5A) of the Act.[37]  Due to the GOC's failure to cooperate to the best of its ability, Commerce maintains that such circumstances existed in this review.

We have reevaluated the information on the record regarding the Synthetic Yarn and Caustic Soda for LTAR subsidies and addressed the "specificity" requirement in the statute, pursuant to the Court's instructions.  After evaluating the record evidence, as discussed in detail below, Commerce finds that these subsidies meet the specificity requirements of the Act.

---

[34] *See, e.g.*, *Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2013*, 80 FR 77318 (December 14, 2015), and accompanying IDM at Comment 1 ("the {Government of China} has provided no new evidence in this review that would cause us to reverse our findings from prior administrative reviews regarding the specificity of the steam coal for {less than adequate remuneration} program."); *Final Results of Countervailing Duty Administrative Review:  Certain In-Shell Pistachios from the Islamic Republic of Iran*; 71 FR 37056 (June 29,  2006), and accompanying IDM at Comment 2; and *Live Swine from Canada; Final Results of Countervailing Duty Administrative Reviews*, 61 FR 52408 (October 7,  1996) ("it is the Department's policy not to reexamine the issue of {a} program's countervailability in subsequent reviews unless new information or evidence of changed circumstances is submitted which warrants reconsideration.").
[35] *See 2015 Preliminary Results* PDM, unchanged in *2015 Final Results* IDM at Comment 1.
[36] *See* GOC Additional Questionnaire.
[37] *See Yama Ribbons* at 34.

At the outset, the Court noted that "Commerce attributed to Yama participation in what the agency termed 'programs' that were identified as 'Provision of Synthetic Yarn for LTAR' and 'Provision of Caustic Soda for LTAR.'"[38]  The Court then focused on particular statements made in the GOC's response that "{i}n the GOC's view, there is no program such that synthetic yarn {or caustic soda} is provided for LTAR to the respondent."[39]  The Court went on rule that it "does not sustain the Department's decision to use adverse inferences to deem Yama to have received a financial benefit from a program or programs that met the specificity requirement of the Tariff Act, 19 U.S.C. § 1677(5A) (*i.e.*, section 771(5A) of the Act) in providing synthetic yarn and caustic soda for less-than-adequate-remuneration."[40]  The Court found that "Commerce reached these adverse inferences despite uncontradicted record evidence, consisting of the aforementioned questionnaire responses of the Chinese government, that no such program or programs existed."[41]  The Court concluded that "Commerce did not present a convincing reason for concluding that the specificity requirement of the Tariff Act, 19 U.S.C. 1677(5) and (5A), (*i.e.*, section 771(5) and (5A) of the Act) was met."[42]  In addition, the Court reasoned that "even if the suppliers are presumed, *arguendo*, to be authorities as a result of government control, it does not follow that government programs necessarily existed to provide these inputs at less-than-adequate remuneration."[43]

As an initial matter, Commerce's reference to and use of the term "program" may have created some confusion that Commerce seeks to clarify in this redetermination.  The applicable statutory provision does not refer to or otherwise use the term "program."  The statutory

---

[38] *Id.* at 22.
[39] *Id.* at 24.
[40] *Id.* at 29.
[41] *Id.* at 30.
[42] *Id.*
[43] *Id.* at 31.

provision, section 771(5) of the Act, defines the terms "countervailable subsidy" and "subsidy," and does not refer to or use the term "program."  In particular, the specificity section in 771(5A) of the Act does not indicate that Commerce must find a "program" to be specific.  Rather, that section focuses on whether a "subsidy" is specific.  In interpreting and applying the applicable provision, Commerce's focus is, therefore, on the subsidy itself.  At one point, Commerce sought to define the term "program" in a proposed regulation, but did so in a manner consistent with section 771(5A) of the Act, emphasizing that "the use of this term is for purposes of convenience; it is not intended to limit the universe of countervailable subsidies to certain routine actions of a foreign government."[44]  Commerce accordingly defined the term "program" as "any act or practice of a foreign government."[45]  In particular, Commerce noted the example of "equity infusions in a firm by a government, which tend to be isolated acts, would be regarded as a program for purposes of the regulations."[46]  Consistent with section 771(5A) of the Act, the aim of the prior regulation was to address the provision of the subsidy itself.

While Commerce's current regulation no longer defines the term, Commerce has continued to use the term solely as shorthand and for convenience, but this reference is not a legal term, and its use is not and cannot be inconsistent with the statutory provision.  In addition to the governing statutory provisions discussed above, 19 CFR 351.511 directly addresses Commerce's examination with respect to the provision of goods and services for LTAR.  Thus,

---

[44] *See Countervailing Duties; Notice of Proposed Rulemaking and Request for Comments*, 54 FR 23366, 23367 (May 31, 1989).

[45] *Id.*

[46] *Id.*; *see also Countervailing Duties, Notice of Proposed Rulemaking and Request for public comments*, 62 FR 8818, 8818-9 (February 26, 1997), noting that "{i}n the case of CVD methodology, {Commerce's} existing 'regulations' consist largely of the proposed regulations published in 1989 ('1989 Proposed Regulations')." Commerce acknowledged that "{b}ecause {Commerce} never issued final rules, the 1989 Proposed Regulations were not binding on {Commerce} or private parties.  Nevertheless, to some extent both the Department and private parties relied on the 1989 Proposed Regulations as a restatement of {Commerce's} CVD methodology as it existed at that time."  Commerce went on to point out that the 1989 Proposed Regulations served as a "point of departure for any new regulations dealing with CVD methodology."

for the LTARs at issue in this case, consistent with the regulation, a countervailing subsidy exists when an authority provides a good for LTAR and when the provision of that subsidy is specific.[47]  A separate finding of a "program" is not required under the law and is not part of Commerce's determination, as Commerce looks specifically to the subsidy itself.  Thus, for the LTARs at issue, an authority can provide a subsidy by providing a good at LTAR to an enterprise, industry, or group thereof, notwithstanding whether the government intended to subsidize the recipient or set up a program to do so.  The only questions under the statute are whether the authority provided the respondent with a subsidy, whether the subsidy is specific, and whether a benefit is thereby conferred.[48]  Accordingly, Commerce does not place weight on the GOC's statements concerning whether a program exists.  To the contrary, the evidence sought is whether the synthetic yarn and caustic soda producers are authorities under the law; whether the prices of the inputs purchased are made at prices that are at LTAR; and whether the subsidy provided is limited to an enterprise, industry, or group thereof.  This is the evidence Commerce sought to obtain to make its determination.

In this redetermination, it is unnecessary for Commerce to revisit its determination with respect to whether the producers of synthetic yarn and caustic soda are authorities within the meaning of section 771(B) of the Act, as the Court has not reached this particular issue for purposes of the Court's ruling and remand.[49]

### a) Commerce's Findings on the Provision of Synthetic Yarn and Caustic Soda for LTAR

In this administrative review, to determine specificity for the provision of synthetic yarn and caustic soda, Commerce requested that the GOC respond to specific questions, as follows:

---

[47] *See* 19 CFR 351.511.
[48] *See* sections 771(5)(A) and (B) of the Act.
[49] *See Yama Ribbons* at 30.

Provide a list of the industries in China that purchase synthetic yarn directly, using a consistent level of industrial classification. Provide the amounts (volume and value) purchased by the industry in which the mandatory respondent companies operate, as well as the totals purchased by every other industry. In identifying the industries, please use whatever resource or classification scheme the Government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under review are classified.[50]

In its response, the GOC stated:

The GOC does not impose any limitations on the use of synthetic yarn and producers of synthetic yarn are free to sell their product to any purchaser and at any price. Similarly, purchasers of synthetic yarn are free to source their product from any producer, domestic or foreign. As a general matter, synthetic yarn has a wide range of uses, including but not limited to use in the narrow ribbon industry.[51]

The only sentence relevant to Commerce's specificity questions in the above answer was the last sentence. That sentence, however, was non-responsive to Commerce's question as it provided no list of industries, as requested. Without any supporting information, the statement amounted to a speculative, conclusory statement and, thus, did not answer any of Commerce's questions on specificity. The GOC provided the same answer verbatim for caustic soda. Commerce then issued a supplemental questionnaire, seeking the same information again for both synthetic yarn and caustic soda.[52] This time, the GOC's response was different. It claimed "[t]he GOC does not maintain such information, as the industry classification in question is not used or maintained as requested."[53]

Based on the above, we find that the information on the record is incomplete regarding whether these subsidies are specific within the meaning of the statute. Specifically, the GOC

---

[50] *See* GOC Additional Questionnaire at Attachment at 4, Question #8. Commerce requested the same information on caustic soda at 7, Question #8.

[51] *See* GOC's SQR at 34-35. The GOC provided the same response with respect to caustic soda at 55-56.

[52] *See* June 21, 2018 Supplemental Questionnaire at 3-4, Question #11, pertaining to both synthetic yarn and caustic soda.

[53] *See* July 12, 2018 Supplemental Response at 44, Answer to Question #11.

failed to provide necessary information that Commerce requested regarding whether these subsidies are *de facto* specific within the meaning of section 771(5A) of the Act.  Regarding *de facto* specificity, Commerce requested that the GOC:  (1) provide a list of industries in China that purchase synthetic yarn and caustic soda; (2) provide the amounts (volume and value) purchased by the industry in which the mandatory respondent company operates, as well as the totals purchased by every other industry; and (3) identify the classification scheme the government normally relies on to define industries and classify companies.  However, the GOC failed to provide the requested information.[54]

Accordingly, because the GOC failed to provide this necessary information, Commerce is relying on facts otherwise available for this determination.[55]  Moreover, as a result of the incomplete responses to Commerce's supplemental questionnaire,[56] we find that the GOC failed to cooperate by not acting to the best of its ability in providing requested information.[57]

Therefore, in the absence of the requested information from the GOC in the instant review regarding the *de facto* specificity of these programs, we examined the 2015 NSA Information which we placed on the record.  Specifically, regarding the Provision of Synthetic Yarn for LTAR program, in its 2015 NSA, the petitioner provided information demonstrating that synthetic yarn is used solely by the textiles industry in China.[58]  In past cases, Commerce has found that when use of an input was limited to eight industries, the industries were limited in number in China and, thus, the subsidy was *de facto* specific.[59]  Consequently, we find that the

---

[54] *See* GOC's SQR.

[55] *See* section 776(a)(1) of the Act.

[56] *See* July 12, 2018 Supplemental Response at 44, Answer to Question #11.

[57] *See* section 776(b) of the Act.

[58] *See* 2015 NSA Information at 2015 NSA (at Exhibits II-E and II-P).

[59] *See, e.g., Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) (*CWP from China*), and accompanying IDM at Comment 7.

use of synthetic yarn by one industry (the textiles industry) is limited in number and, as a result, the Provision of Synthetic Yarn for LTAR program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.

Similarly, regarding the Provision of Caustic Soda for LTAR program, in its 2015 NSA, the petitioner provided information demonstrating that caustic soda is used by only a limited number of industries (*i.e.*, chemicals, pulp and paper, aluminum, food, water treatment, and textiles) in China.[60]  As noted above, Commerce has found that when eight industries used an input in China, these industries were limited in number and, thus, the subsidy was *de facto* specific.[61]  Consequently, we find that the use of caustic soda by six industries is limited in number to a few industries and, as a result, the Provision of Caustic Soda for LTAR program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

Even though the GOC responded to Commerce's requests regarding these subsidies, claiming that no such programs existed, information on the record demonstrates that the GOC's assertions that no program existed were incorrect.[62]  Indeed, the GOC provided no response challenging the substance of this record information, despite having the opportunity to do so.

Finally, with regard to the GOC's statements in its responses to Commerce that it does not regulate the pricing of synthetic yarn or caustic soda, and the provision of synthetic yarn and caustic soda is dictated by market forces, not by any plan that sets the levels of production or the development of these inputs, we note that the GOC provided this information in response to questions regarding the *de jure* specificity of these input LTAR programs.  Commerce agrees with the GOC that the Provision of Synthetic Yarn and Caustic Soda for LTAR programs are not

---

[60] *See* 2015 NSA Information at 2015 NSA (at Exhibits III-B and III-H).
[61] *See CWP from China* IDM at Comment 7.
[62] *See* 2015 NSA Information at 2015 NSA at Exhibit II-P and Exhibit III-H.

*de jure* specific.  However, the fact that the prices and the production of these inputs are not regulated by the GOC is not meaningful to our analysis of the *de facto* specificity of these subsidies, which is why Commerce did not address this information, either through supplemental questionnaires or in either the preliminary or final results of the 2016 administrative review.

Consequently, Commerce finds that the Provision of Synthetic Yarn and Caustic Soda for LTAR programs meet the specificity requirements of the statute.[63]  As a result, despite the GOC's claims to the contrary, Commerce maintains that these input LTAR subsidies are countervailable subsidies which provided a benefit to Yama during the POR.[64]

### b)  2015 NSA Information

Finally, we disagree with Yama that Commerce was either not authorized to place NFI on the record of this remand redetermination or that the information placed on the record by Commerce is not necessary to comply with the Court's order.[65]  The Court has previously held that Commerce may reopen the record on remand, unless the Court includes specific language barring Commerce from doing so.[66]  Importantly, the NFI Commerce placed on the record is directly relevant to the Court's order, in which the Court held that Commerce "did not conduct an analysis sufficient to support an adverse inference that any such programs would have met the specificity requirement of the Tariff Act so as to result in countervailable subsidies" and directed Commerce to "take corrective action that is necessary to fulfill the requirements of the statute."[67] We believe that Commerce's inclusion and analysis of the 2015 NSA Information complies with this instruction from the Court.

---

[63] *See* section 771(5A)(D)(iii)(I) of the Act.
[64] *See* section 771(5)(B) of the Act.
[65] *See* Yama's Comments.
[66] *See Shandong Rongxin Import & Export Co., Ltd., v. United States*, 203 F. Supp.3d 1327 (CIT Feb 3, 2017).
[67] *See Yama Ribbons* at 38.

## VI.    INTERESED PARTY COMMENTS

On June 29, 2021, Commerce released the draft results of redetermination to all interested parties, and invited parties to comment.[68]  On July 7, 2021, we received comments from Yama, which are summarized below.[69]

### 1)  **Export Buyer's Credit Program**

- Yama endorses Commerce's exclusion of the EBCP from its overall subsidy rate.

### 2)  **The Provision of Synthetic Yarn and Caustic Soda for LTAR**

- Commerce's redetermination fails to comply with the Court's order.  Commerce continues to find that AFA is warranted, but it does not address or defend its rationale for the use of AFA.  Nowhere does Commerce's redetermination address the Court's finding that the GOC fully answered the relevant questions and that the administrative record is complete.  Commerce implicitly proceeds from its original finding that AFA is warranted and bases its entire redetermination on that assumption.[70]
- Commerce tries to use semantics as an excuse not to comply with the Court's order.  The relevance of the term "program" relates to the question of Commerce's first supplemental questionnaire to the GOC, regarding the laws, plans, or policies pertaining to the inputs at issue.  In response, the GOC stated that it did not have any LTAR programs regarding the two inputs.  The GOC used the term "program" as a synonym for the laws, plans, or policies referenced in the question.  Thus, the GOC's answer is clear and the Court agreed.
- Nowhere in the draft remand redetermination does Commerce assert that it asked simply about "subsidies" in its questionnaires, only as a *post hoc* justification to ignore the GOC's clear answers, Commerce says that "program" is not a legal term.  A "law, plan, or policy" is tantamount to a "program," yet Commerce belatedly argues that "programs" are no longer relevant.
- If this is true, Commerce asked the wrong question in this administrative review.  No party is obliged to guess that Commerce was asking about a subsidy, rather than a law, plan, policy, or program.[71] Thus, the GOC cannot be penalized for not answering Commerce's unasked question about "subsidies" (which Commerce failed to ask once, much less twice, as required by the statute before it can apply AFA).

---

[68] *See* Draft Results of Redetermination Pursuant to Court Remand, Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China, *Yama Ribbons and Bows Co., v. United States*, Court No. 19-00047, Slip. Op. 21-50 (CIT April 30, 2021), dated June 29, 2021 (Draft Results of Redetermination).

[69] *See* Yama's Letter, "Comments on Draft Remand Redetermination," dated July 7, 2021 (Yama's Redetermination Comments).

[70] *Id*. at 3.

[71] *Id*. at 4.

- Moreover, while the Court noted that there is no gap in the record to which Commerce could apply AFA, Commerce completely dismisses the GOC's response concerning any program for LTAR.  Thus, Commerce continues to ignore the substantial evidence on the record that the Court cited in its order.[72]

- In any event, the issue of specificity is moot.  Once the Court determined that the GOC answered the question about the existence of any law, plan, or policy regarding LTAR, Commerce's inquiry should have ended.[73]

- Commerce provides no evidence, beyond mere speculation that subsidies can just appear without any law, plan, policy, or program.[74]

- Commerce determined that the record was incomplete regarding specificity.  The administrative record demonstrates that the GOC could not answer certain questions regarding specificity.  Commerce cannot hold the GOC accountable and apply AFA to it for information it does not possess.[75]

- Commerce has framed its LTAR analysis incorrectly.  Rather than looking at LTAR overall to make such a decision, Commerce is looking at specific inputs, such as synthetic yarn and caustic soda, which results in Commerce artificially finding LTAR benefits in all industries.  Commerce's framing of the specificity question in this manner ensures that no industry in China can win this argument, a result which is neither reasonable nor fair.[76]

- Commerce inexplicably accepts certain answers from the GOC for *de jure*, but not *de facto*, specificity purposes, which is unreasonable.[77]  The purpose of Commerce's LTAR analysis is to determine whether the GOC has attempted to manipulate the market, through either production quantity or prices, for synthetic yarn and caustic soda.  Commerce states that the GOC's answers to these answers are not relevant to its *de facto* specificity inquiry, which begs the question of why Commerce asked the GOC about LTAR laws, plans, policies, in the first place.

- Commerce abrogated its duty to consider all evidence on the record and now admits that it intentionally refrained from asking the GOC certain questions.[78]

- The Court gave Commerce neither implicit nor explicit authority to add information from the 2015 administrative review to the record.  Indeed, Commerce admits that the Court found its analysis lacking, not the data.[79]  Moreover, the 2015 data is up to 10 years old and has no relevance to the underlying administrative review.

---

[72] *Id*. at 5.

[73] *Id*.

[74] *Id*. (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002))).

[75] *Id*. at 6-7.

[76] *Id*. at 7.

[77] *Id*. at 7-8.

[78] *Id*. at 8 (citing Draft Results of Redetermination at 16-17).

[79] *Id*. at 9 (citing Draft Results of Redetermination at 17).

*Commerce's Position*:

As an initial matter, we disagree with Yama that Commerce did not comply with the Court's order.  The Court in its order found that "Commerce acted unlawfully in deciding to include subsidy rates related to Yama's synthetic yarn and caustic soda inputs without considering all relevant record evidence, in particular the uncontradicted record evidence that no programs existed during the POR that provided these inputs at LTAR.  Commerce, in addition, did not conduct an analysis sufficient to support an adverse inference that any such programs would have met the specificity requirement of the Tariff Act so as to result in countervailable subsidies."[80]  Therefore, as discussed above, Commerce considered all record evidence regarding these input LTAR programs, including the GOC's claims that these programs do not exist, concluding that information on the record demonstrates that the GOC's assertions were incorrect.[81]  Moreover, as set forth above, Commerce conducted a detailed analysis to support how these programs meet the specificity requirements of the Act.  Thus, we find that the Draft Results of Redetermination was directly responsive to the Court's order.

We also disagree that the evidence on the record demonstrates that the GOC acted to the best of its ability to respond to Commerce's request for information.  As Commerce discussed above, the GOC failed to provide necessary information that Commerce requested in this administrative review regarding whether these subsidies are *de facto* specific within the meaning of section 771(5A) of the Act.[82]  Specifically, as a result of the GOC's incomplete responses to

---

[80] *See Yama Ribbons* at 38.
[81] *See* 2015 NSA Information at 2015 NSA at Exhibit II-P and Exhibit III-H.
[82] *See* GOC's SQR.

Commerce's supplemental questionnaire,[83] we continue to find that the GOC failed to cooperate by not acting to the best of its ability in providing requested information.[84]

Moreover, we disagree that the distinction Yama attempts to draw between a program and a subsidy is meaningful.  Under Commerce's analysis of the provision of goods and services for LTAR, a countervailing subsidy exists when an authority provides a good for LTAR and when the provision of that subsidy is specific.[85]  As explained above, a separate finding of the existence of a "program" is not required under the law and is not part of Commerce's determination, as Commerce looks specifically to the subsidy itself.  Thus, for the input LTARs, an authority can provide a subsidy by providing a good at LTAR to an enterprise, industry, or group thereof, notwithstanding whether the government intended to subsidize the recipient or set up a program to do so.  As a result, Commerce does not place weight on the GOC's statements concerning whether a program exists.  Therefore, the only questions under the statute are whether the authority provided the respondent with a financial contribution, whether the subsidy is specific, and whether a benefit is thereby conferred.[86]

Accordingly, in analyzing whether an authority provided a financial contribution to a respondent such that the benefit of a good or service provided for LTAR was conferred and the subsidy was specific, Commerce sought evidence on whether Yama's synthetic yarn and caustic soda input producers were authorities under the law, whether the prices of the inputs purchased were made at prices that are at LTAR, and whether the subsidy provided was limited to an enterprise, industry, or group thereof.[87]  This is the evidence Commerce sought to obtain to make

---

[83] *See* July 12, 2 018 Supplemental Response at 44, Answer to Question #11.
[84] *See* section 776(b) of the Act.
[85] *See* 19 CFR 351.511; *see also* section 771(5)(E)(iv) of the Act (providing that a benefit shall normally be conferred where there is a benefit to the recipient "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration.").
[86] *See* sections 771(5)(A) and (B) of the Act.
[87] *See* section 771(5)(B) of the Act.

its determination whether this countervailable subsidy exists.  To that end, Yama's assertion that the GOC could not have failed to respond to a question Commerce did not ask because Commerce should have asked it about "subsidies" in its questionnaires rather than a "law, plan, policy, or program" is incorrect.  Commerce asked relevant questions for its subsidy analysis, consistent with the requirements of the Act, to which the GOC failed to provide a sufficient response.

In any event, despite Yama's claims, the issue of specificity is not moot in this remand redetermination.  As discussed above, the Court focused exclusively on Commerce's specificity determination.  Thus, pursuant to the Court's order, we reevaluated the information on the record regarding the Provision of Synthetic Yarn and Caustic Soda for LTAR subsidies and addressed the "specificity" requirement in the statute.  In particular, in the absence of the requested information from the GOC in the instant review regarding the *de facto* specificity of these programs, we examined the 2015 NSA Information which we placed on the record and found that it showed that the Provision of Synthetic Yarn and Caustic Soda for LTAR programs are *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.

We also disagree with Yama that the GOC responded to Commerce's inquiries.  As detailed above, the GOC failed to provide a response to Commerce's question regarding the list of industries relevant to its specificity analysis.[88]  Further, contrary to Yama's claim, Commerce's inquiry could not have simply concluded if the GOC had explained that these LTAR programs "didn't exist."  Rather, because the GOC failed to provide information relevant to Commerce's analysis regarding whether caustic soda or synthetic yarn were provided to Yama for LTAR (not simply whether the GOC believed such an LTAR program to exist), Commerce

---

[88] *See supra* at 14; *see also* GOC's SQR at 34-35 and 55-56.

applied facts available with an adverse inference due to the GOC's failure to act to the best of its ability in determining that these programs were *de facto* specific.

In addition, we disagree with Yama that Commerce was unreasonable in accepting certain answers from the GOC for *de jure*, but not *de facto*, specificity purposes. A specificity determination is not the simple approach Yama suggests. Our determination concerns not only an analysis of whether *de jure* specificity exists, but also whether *de facto* specificity exists. Because of the different nature of these inquiries, the questions Commerce asks in its questionnaire regarding *de facto* and *de jure* specificity must also differ. The GOC responded to Commerce's *de jure* specificity question by indicating that it does not regulate the pricing of synthetic yarn or caustic soda, and the provision of synthetic yarn and caustic soda is dictated by market forces, not by any plan that sets the levels of production or the development of these inputs.[89] However, in response to Commerce's question regarding *de facto* specificity, the GOC did not provide Commerce the necessary information Commerce requested to perform a *de facto* specificity analysis (*i.e.*, that the GOC:  (1) provide a list of industries in China that purchase synthetic yarn and caustic soda; (2) provide the amounts (volume and value) purchased by the industry in which the mandatory respondent company operates, as well as the totals purchased by every other industry; and (3) identify the classification scheme the government normally relies on to define industries and classify companies). Thus, while the GOC provided *a* response, it was non-responsive to Commerce's *de facto* specificity questions as it provided no list of industries, as requested.[90] Without any supporting information, the statement amounted to a speculative, conclusory statement and, thus, did not answer any of Commerce's questions on

---

[89] *See* GOC's SQR at 34 and 55.
[90] *See supra* at 14; *see also* GOC's SQR at 34-35.  The GOC provided the same response with respect to caustic soda at 55-56  (emphasis added).

specificity.[91]  Commerce then issued a supplemental questionnaire, seeking the same information again for both synthetic yarn and caustic soda.[92]  This time, the GOC claimed that "{t}he GOC does not maintain such information, as the industry classification in question is not used or maintained as requested."[93] As a result, we continue to find that the GOC did not provide Commerce with the information required to perform a *de facto* specificity analysis.

Finally, we disagree with Yama that Commerce had no authority to place the 2015 NSA Information on the record of this proceeding and that this information was not relevant.  As discussed above, the NFI Commerce placed on the record is directly relevant to the Court's order.[94]  Thus, we believe that Commerce's inclusion and analysis of the 2015 NSA Information complies with the Court's instructions.  We also find that this information is relevant to Commerce's analysis because it directly relates to the Provision of Synthetic Yarn and Caustic Soda LTAR programs and is the information on which Commerce relied to initiate these programs in the 2015 administrative review.  Additionally, there is nothing on the record to indicate that the information on which we relied to initiate these programs in the 2015 administrative review was not still relevant during the 2016 administrative review and did not represent the makeup of the synthetic yarn and caustic soda industries during the POR.

Consequently, we made no changes to the draft results of redetermination for these final results of redetermination in response to Yama's comments.

---

[91] *Id.*
[92] *See* June 21, 2018 Supplemental Questionnaire at 3-4, Question #11, pertaining to both synthetic yarn and caustic soda.
[93] *See* July 12, 2018 Supplemental Response at 44, Answer to Question #11.
[94] *See Yama Ribbons* at 38.

## VII.  FINAL RESULTS OF REDETERMINATION

Consistent with the instructions of the Court, we have continued to use the same approach in the final results of redetermination.  As a result of our redetermination, we are excluding the EBCP from the subsidy programs included in Yama's overall subsidy rate for the POR.  However, Commerce continues to include the synthetic yarn and caustic soda for LTAR program rates (*i.e.*, 10.45 percent and 0.26 percent, respectively) in Yama's overall subsidy rate. Accordingly, the resulting overall subsidy rate for Yama is 13.16 percent.  Because Yama's recalculated overall subsidy rate is different from the overall subsidy rate in the *Final Results*, we intend to issue a *Timken Notice* with the amended final results, should the Court sustain these final results of redetermination.

8/12/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance