Slip Op. No. 22-138

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **YAMA RIBBONS AND BOWS CO., LTD.** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | **Before:  Timothy C. Stanceu, Judge** |
| Defendant, | **Court No. 19-00047** |
| and | |
| **BERWICK OFFRAY LLC,** | |
| Defendant-Intervenor. | |

## OPINION

[Sustaining an agency decision following court order in a countervailing duty proceeding on narrow woven ribbons with woven selvedge from the People's Republic of China]

Dated:  December 8, 2022

*John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co., Ltd.  With him on the brief were *Alexandra H. Salzman*, *Judith L. Holdsworth*, and *J. Kevin Horgan*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With her on the brief was *Bryan M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Daniel B. Pickard*, Buchanan Ingersoll and Rooney PC, of Washington D.C., for defendant-intervenor Berwick Offray LLC.

Stanceu, Judge:  Plaintiff Yama Ribbons and Bows Co., Ltd. ("Yama") brought this action to contest a final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude a review of a countervailing duty ("CVD") order on narrow woven ribbons with woven selvedge from the People's Republic of China ("China" or the "PRC").  The court sustains a decision Commerce issued in response to the court's previous opinion and order.

## I. BACKGROUND

Yama, a Chinese producer and exporter of ribbons, brought this action on April 9, 2019, to contest a published agency decision (the "Final Results"), *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 11,052 (Int'l Trade Admin. Mar. 25, 2019) (the "*Final Results*").  Summons, ECF No. 1; Compl. ¶ 1, ECF No. 6.  The Final Results concluded the sixth periodic administrative review of the countervailing duty order on narrow woven ribbons with woven selvedge from the People's Republic of China (the "Order"), which Commerce initiated in November 2017 and which pertained to a period of review ("POR") corresponding to calendar year 2016.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 52,268,

52,273 (Int'l Trade Admin. Nov. 13, 2017).  Commerce accompanied the Final Results

with an "Issues and Decision Memorandum."  *Final Results*, 84 Fed. Reg. at 11,052;

*Decision Memorandum for the Final Results of 2016 Countervailing Duty Administrative*

*Review: Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*

(Int'l Trade Admin. Mar. 19, 2019) (PR Doc. 117) ("*I&D Mem.*").[1]

 Background on plaintiff's action is provided in the court's previous opinion and

order, *Yama Ribbons and Bows Co., Ltd. v. United States*, 45 CIT __, __, 517 F. Supp. 3d

1325, 1326–28 (2021) ("*Yama I*"), and is supplemented herein.  In *Yama I*, this court

considered Yama's motion for judgment on the agency record, submitted under USCIT

Rule 56.2.  Pl. Yama Ribbons and Bows Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency

R. (Aug. 9, 2019), ECF No. 25; Mem. of Law in Supp. of Pl. Yama Ribbons and Bows Co.,

Ltd.'s 56. 2 Mot. for J. upon the Agency R. (Aug. 9, 2019), ECF No. 26 ("Pl.'s Mem.").

Granting this motion, *Yama I* directed that Commerce reconsider the Final Results and

submit a redetermination in conformance with the court's opinion and order.  45 CIT at

__, 517 F. Supp. 3d at 1341–42.  Before the court is that decision (the "Remand

---

[1] Documents in the original Joint Appendix (Dec. 10, 2019), ECF Nos. 34 (conf.), 35 (public), are cited herein as "CR Doc. __" and "PR Doc. __," respectively.  Public documents in the Joint Appendix for Remand (Oct. 12, 2021), ECF No. 55, are cited herein as "PPR Doc. __."

Redetermination"), submitted on August 13, 2021.  Final Results of Redetermination

Pursuant to Court Remand, ECF No. 47-1 ("*Remand Redetermination*").

     Yama was the sole exporter or producer reviewed in the administrative

proceeding at issue in this litigation.  *See Yama I*, 45 CIT at __, 517 F. Supp. 3d at 1327.

In the Final Results, Commerce determined a total net countervailable subsidy rate of

23.70% for Yama, which was the sum of subsidy rates Commerce determined for

sixteen subsidy programs that Commerce considered to have benefitted Yama.  *Id.*,

45 CIT at __, 517 F. Supp. 3d at 1327–28.

     In this litigation, Yama is contesting the Department's inclusion within the total

net countervailable subsidy rate of three individual subsidy rates: (1) a subsidy rate of

10.54% for the "Export Buyer's Credit Program" ("EBCP"); (2) a subsidy rate of 10.45%

for the provision of synthetic yarn at what Commerce considered to be less-than-

adequate-remuneration ("LTAR"); and (3) a subsidy rate of 0.26% for the provision of

caustic soda at what Commerce considered to be LTAR.  *Id.*, 45 CIT at __, 517 F. Supp.

3d at 1328.  In *Yama I*, the court ordered Commerce to reconsider all three of these

individual subsidy determinations.  45 CIT at __, 517 F. Supp. 3d at 1341–42.

     In the Remand Redetermination, Commerce, "under respectful protest,"

reversed its decision to include in the total net countervailable subsidy rate of 23.70% a

subsidy rate for the Export Buyer's Credit Program.  *Remand Redetermination* at 9.

Commerce left unchanged its inclusion of the 10.45% rate for synthetic yarn and the

0.26% rate for caustic soda, determining a revised total net countervailable subsidy rate

of 13.16%. *Id.* at 25.

The court received comments from Yama supporting in part, and opposing in

part, the Remand Redetermination.  Comments by Yama Ribbons and Bows Co., Ltd.

on Commerce's Final Results of Redetermination Pursuant to Court Remand (Sept. 13,

2021), ECF No. 52 ("Pl.'s Comments").  Defendant responded to Yama's comments,

advocating that the court sustain the Remand Redetermination.  Def.'s Resp. to

Comments on Remand Redetermination (Sept. 28, 2021), ECF No. 54 ("Def.'s Resp.").

The court did not receive comments from defendant-intervenor.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts

Act of 1980, 28 U.S.C. § 1581(c)[2], pursuant to which the court reviews actions

commenced under section 516A of the Tariff Act of 1930, *as amended* ("Tariff Act"),

19 U.S.C. § 1516a, including an action contesting a final determination that Commerce

---

[2] All citations herein to the United States Code are to the 2018 edition.  All
citations to the Code of Federal Regulations are to the 2018 edition.

issues to conclude an administrative review of a countervailing duty order.  *See id*.

§ 1516a(a)(2)(B)(iii).

In reviewing an agency determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  *Id*. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B.  The Export Buyer's Credit Program

The Export Buyer's Credit Program is "an export-promoting loan program

administered by the Export-Import Bank of China."  *Yama I*, 45 CIT at __, 517 F. Supp.

3d at 1329 (citation omitted).  The court noted in *Yama I* that "[i]n the sixth review,

Commerce included a rate for the EBCP in Yama's overall subsidy rate without

reaching a factual finding that Yama actually received a benefit from the EBCP" and

that "[i]nstead, Commerce stated its primary finding in the negative: 'In these final

results, we continue to find that the information on the record does *not* support finding

that Yama did *not* use the Export Buyer's Credit program during the POR.'"  *Id*.

(citation omitted).  The court's opinion explained that "[a]t issue is the statutory

requirement that Commerce, in order to impose a countervailing duty, find that an

authority provided a financial contribution 'to a person and a benefit is thereby

conferred,'" *id*. (citing 19 U.S.C. § 1677(5)(B)), and that "[r]ather than make the

affirmative finding that a financial contribution was provided to Yama and a benefit

was thereby conferred, Commerce inferred a contribution and benefit to Yama by

invoking its 'facts otherwise available' authority under 19 U.S.C. § 1677e(a) and its

'adverse inference' authority under 19 U.S.C. § 1677e(b)." *Id*., 45 CIT at __, 517 F. Supp.

3d at 1329–30.  "When using both provisions, Commerce refers to 'adverse facts

available,' or 'AFA.'" *Id*., 45 CIT at __, 517 F. Supp. 3d at 1330 n.4.

The court held in *Yama I* that "[t]here was no evidence on the record of the

review to support a finding that any U.S. customer of Yama used the EBCP, and the

record contained evidence refuting any such finding." *Id*., 45 CIT at __, 517 F. Supp. 3d

at 1335.  The court directed that "[o]n remand, Commerce must consider the record

evidence fairly and impartially and reach a new determination on whether Yama

benefitted from the EBCP." *Id*.

In the Remand Redetermination, Commerce decided, based on the record

evidence, that Yama did not use the EBCP.  It explained that decision in this way:

> Consistent with *Yama Ribbons* ["*Yama I*"], we have reconsidered our
> determination, based on the application of AFA, that Yama used and
> benefited from the EBCP during the POR.  We also considered the record
> evidence which Yama and the GOC [government of China] provided
> regarding Yama's and its customers' non-use of the EBCP.  Upon
> reexamination of the record evidence, we have complied with the Court's

ruling and now find that Yama did not use this program during the POR, under respectful protest.  Our findings with respect to the financial contribution and specificity determinations made in the *Final Results* remain unchanged.

Specifically, in accordance with the Court's remand order, we are relying on Yama and the GOC's [government of China's] statements on the record that none of Yama's customers used the program during the POR, as well as Yama's customers' declarations of non-use to determine that Yama did not use the EBCP during the POR, under respectful protest.

*Remand Redetermination* at 9 (footnotes omitted).  One of the statements Commerce made is that "[o]ur findings with respect to the financial contribution and specificity determinations made in the *Final Results* remain unchanged."  *Id.* (footnote omitted).  As to the Department's finding "with respect to the financial contribution," *id.*, this statement is inconsistent with the court's ruling.  In *Yama I*, the court expressly disallowed the Department's finding based on an adverse inference that Yama received a financial contribution from the Export Buyer's Credit Program.  The court ruled that "the record evidence does not support a finding that the information Commerce lacked as a result of non-cooperation by the Chinese government prevented Commerce from relying upon or verifying the information Yama provided to show the absence of a benefit from the EBCP."  *Yama I*, 45 CIT at __, 517 F. Supp. 3d at 1330.

The court sustains the Department's new determination that Yama did not benefit from the EBCP, which is supported by substantial evidence on the record of the

review.  For the reason the court has stated, the court does not sustain the entirety of the

Department's discussion of this new determination in the Remand Redetermination.

### C. Yama's Purchases of Synthetic Yarn and Caustic Soda

A countervailable subsidy potentially may exist under the Tariff Act where an

"authority," which is defined in 19 U.S.C. § 1677(5)(B) as a "government of a country or

any public entity within the territory of the country," confers a benefit upon a person by

providing goods "for less than adequate remuneration," *id*. § 1677(5)(E)(iv).  In order to

be countervailable, any such subsidy also must satisfy the "specificity" requirement set

forth in the statute.  *Id*. § 1677(5)(A), (5A).

### 1. The Department's LTAR Determinations in the Final Results Addressing Yama's Synthetic Yarn and Caustic Soda Inputs

For the Final Results, Commerce imposed countervailing duties on Yama's

exported ribbons upon determining that Yama's suppliers of synthetic yarn and caustic

soda were government authorities that conferred a benefit upon Yama by providing

these production inputs for less than adequate remuneration.  As it did with respect to

the EBCP, Commerce imposed these countervailing duties by using "facts otherwise

available" and "adverse inferences" under 19 U.S.C. § 1677e(a) and (b), respectively,

finding that the government of China failed to cooperate when it did not respond to

certain of its inquiries.

Although the Chinese government reported in questionnaire responses that none

of the eight suppliers to Yama of synthetic yarn, nor the sole supplier of caustic soda,

was a state-owned enterprise or otherwise majority-owned by the Chinese government,

*see Yama I*, 45 CIT at __, 517 F. Supp. 3d at 1336 (citation omitted), Commerce drew the

adverse inference that these suppliers were "authorities" within the meaning of

19 U.S.C. § 1677(5) upon a finding that the government of China failed to cooperate

when it did not act to the best of its ability in responding to the Department's requests

for information on whether any owners, directors, or senior managers of Yama's

suppliers of synthetic yarn or caustic soda were government or Chinese Communist

Party ("CCP") officials, or whether any of these suppliers had a CCP organization.  *See*

*id.*, 45 CIT at __, 517 F. Supp. 3d at 1336–37.  Commerce concluded, further, that

subsidies provided to Yama by the sales of these two suppliers at LTAR were "specific"

by relying on its prior practices and by adopting various adverse inferences.  *See id.*,

45 CIT at __, 517 F. Supp. 3d at 1337–39.  These included the adverse inference that

"Chinese prices from transactions involving Chinese buyers and sellers are significantly

distorted by the involvement of the GOC."  *I&D Mem.* at 11 (footnote omitted).

Determining what it considered to be adequate remuneration, Commerce calculated the

subsidy rates, 10.45% for synthetic yarn and 0.26% for caustic soda, for inclusion in the

total net countervailable subsidy rate of 23.70%.

### 2. The Court's Order of Remand in *Yama I* on the LTAR Determinations for Synthetic Yarn and Caustic Soda

Contesting the Department's decisions on synthetic yarn and caustic soda, Yama challenged the use of facts otherwise available and adverse inferences, including the Department's drawing the adverse inferences that the specificity requirement of the Tariff Act had been satisfied with respect to both inputs. *Id.*, 45 CIT at __, 517 F. Supp. 3d at 1335 (citation omitted). In the alternative, Yama claimed that Commerce erred in its treatment of ocean freight and value-added tax ("VAT") in calculating the subsidy rates for the two inputs. *Id.* (citation omitted). Because *Yama I* remanded the Final Results to Commerce to reconsider the use of facts otherwise available with adverse inferences, it did not reach Yama's alternative claim at that time.

Without deciding the question of whether Commerce, as an adverse inference, permissibly deemed Yama's suppliers to be "authorities," the court reasoned that even were the court to presume, *arguendo*, that the suppliers were authorities, the court could not sustain the Department's decision to impose countervailing duties upon Yama's exports for these programs as presented in the Final Results. *Id.*, 45 CIT at __, 517 F. Supp. 3d at 1338–39. In the Final Results, Commerce had relied solely upon its prior (fifth) review (for calendar year 2015) and adverse inferences in analyzing whether the "specificity" requirement for a countervailable subsidy had been met in the sixth review. *See I&D Mem.* at 13 (finding specificity based on the GOC's failure to provide

requested information); *see also Remand Redetermination* at 9–10 ("Commerce's

longstanding practice is not to reexamine the specificity of a subsidy that it has

previously found to be countervailable unless new evidence challenges such a

finding.") (footnote omitted).  *Yama I* concluded that this analysis was not sufficient to

support the Department's adverse inferences of a government program or programs

benefitting a limited or preferred group of purchasers of yarn or caustic soda.  45 CIT at

__, 517 F. Supp. 3d at 1340.  In the sixth review, there was record evidence, not

addressed by Commerce in the Final Results, consisting of the government of China's

response to the Department's first supplemental questionnaire, which told Commerce

that no program existed that provided either synthetic yarn or caustic soda for less-

than-adequate remuneration, that the government does not regulate the pricing of those

products, and that the provision of synthetic yarn is dictated by market forces and not

by any plan that sets production levels.  *Yama I*, 45 CIT at __, 517 F. Supp. 3d at 1339

(citations omitted).

     *Yama I* concluded that "Commerce acted unlawfully in deciding to include

subsidy rates related to Yama's synthetic yarn and caustic soda inputs without

considering all relevant record evidence, in particular the uncontradicted record

evidence that no programs existed during the POR that provided these inputs at

LTAR."  *Id*., 45 CIT at __, 517 F. Supp. 3d at 1341.  Further, the court held that

Commerce "did not conduct an analysis sufficient to support an adverse inference that

any such programs would have met the specificity requirement of the Tariff Act so as to

result in countervailable subsidies." *Id*.  The court ordered Commerce to reconsider its

LTAR determinations "and take the corrective action that is necessary to fulfill the

requirements of the statute." *Id.*, 45 CIT at __, 517 F. Supp. 3d at 1342.

### 3.  The Department's Adverse Inferences that the Suppliers of Synthetic Yarn and Caustic Soda Were "Authorities"

As discussed above, *Yama I* deferred considering Yama's challenge to the

Department's treating Yama's suppliers of synthetic yarn and caustic soda as

"authorities" for purposes of the countervailing duty provisions of the Tariff Act.  It did

so pending the Department's conducting a new analysis of the "specificity" issue as to

these two inputs.  Because Commerce now has addressed the specificity issue in its

Remand Redetermination through a new analysis (addressed later in this Opinion), the

court now turns to Yama's challenge to the Department's determinations, based on facts

otherwise available and adverse inferences, that each of the suppliers was an authority

within the meaning of that term as defined 19 U.S.C. § 1677(5).

It is uncontested that the Chinese government did not provide Commerce the

requested information on whether any owners, directors, or senior managers of Yama's

eight suppliers of synthetic yarn or of the sole supplier of caustic soda were government

or CCP officials, or whether any of these suppliers had a CCP organization.  Commerce

explained that:

> While the GOC provided a long narrative explanation of the role of the
> CCP, when asked to identify any owners, members of the board of
> directors, or managers of the input suppliers who were government or
> CCP officials during the POR, the GOC explained that there is "no central
> informational database to search for the requested information," and
> directed Commerce to obtain this information directly from Yama's
> privately-owned suppliers.

*I&D Mem.* at 12 (quoting *Countervailing Duty Supplemental Questionnaire Response* 30

(Apr. 20, 2018) (PR Docs. 35–37) (CR Docs. 16–18) (footnotes omitted) ("*GOC Additional*

*Questionnaire Resp.*")).

Yama argued, first, that the Chinese government acted to the best of its ability in

responding to the inquiry.  Pl.'s Mem. 37.  The court disagrees.  Even if it is presumed,

*arguendo*, that the GOC did not have immediate access to a means of obtaining the

requested information, the GOC's response that Commerce should obtain the

information from Yama's suppliers reveals the GOC's unwillingness to pursue other

means, including, if necessary, inquiring of the suppliers itself, to obtain the

information Commerce sought.  The statute, in 19 U.S.C. § 1677e(b), requires an

interested party to act to the *best* of its ability in responding to a Departmental

information request.  Commerce permissibly found on the record evidence that the

Chinese government, in this instance, had not done so.

Arguing to the contrary, Yama submits that the Tariff Act, in 19 U.S.C.

§ 1677m(c), required Commerce to find that the GOC "complied with the statutes"

when it was unable to submit the information in the requested time and manner,

together with a full explanation, and suggested alternate forms in which the

Department could obtain the information.  Pl.'s Mem. 37.  Yama's argument fails to

address the express requirements of § 1677m(c).  To qualify for the exception specified

thereunder, an interested party from which the information is requested must suggest

"alternative *forms* in which *such party* is able to submit the information . . . ."  19 U.S.C.

§ 1677m(c) (emphasis added).  The GOC did not suggest that it could provide the

requested information in some other form and instead suggested that Commerce look

elsewhere.

It is well established (and Yama does not contest) that Commerce may seek the

information it needs from the exporting government in a countervailing duty

proceeding and, in appropriate circumstances, may invoke its authority under 19 U.S.C.

§ 1677e(b), even if the result is a collateral adverse effect upon a cooperating party.  *See*

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d. 1365, 1372–73 (Fed. Cir. 2014).

Commerce should seek to avoid this adverse effect if the necessary information is

present elsewhere on the record, *see Changzhou Trina Solar Energy Co. v. United States*,

42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018), but that was not the situation here.

Therefore, the GOC's suggestion that the information request be redirected to Yama's suppliers did not negate the Department's authority to draw an adverse inference from the failure of the Chinese government to lend its full cooperation.

Finally, Yama argues that there are no "'facts otherwise available' on the record suggesting that CCP's involvement in a private company is sufficient to transform the company into a government authority" and that the record evidence is that the Chinese government "is prohibited by law from interfering in the ordinary business operations and management of a company." Pl.'s Mem. 41–42. The court rejects this argument.

The implied premise of Yama's argument is that Commerce lacked authority to pursue its inquiries as to *whether*, or *how*, the presence of government or CCP officials, or a CCP organization, in any specific supplier of Yama allowed meaningful government control over that company. Yama's argument, which refers to the responses the government of China put on the record, speaks in generalities about the role of the CCP in Chinese private companies in general. It does not speak to the individual situations presented by the record facts of this case, which involved a failure to cooperate on the part of the government of China with respect to information about the governance of the specific suppliers. Had the GOC acted to the best of its ability in responding to the inquiry about whether government or CCP officials are present in any of Yama's privately-owned input suppliers as owners, managers, or directors,

Commerce may have been in a position to make further inquiries, and learn details, as

to the functions such individuals, if reported to be present in a supplier company, had

the authority to perform.  In short, the government of China, by declining to provide, or

even endeavor to provide, the requested information concerning CCP members in the

ownership or management structure of these companies, effectively cut off the

Department's ability to investigate the matter further.  As the authority granted in

19 U.S.C. § 1677e signifies, Congress intended for Commerce, not an interested party, to

control the scope of the inquiry so that Commerce freely may perform its statutory

function.  While Yama points to generalized record evidence that it argues could

support a finding that CCP presence did not amount to government control, Commerce

was not *required* to make such a finding, given that the Department's investigative

ability was hindered by the GOC's failure to cooperate on the question of a possible

CCP presence in the suppliers.  Commerce, therefore, acted within its statutory

authority when it drew two adverse inferences as to Yama's suppliers: first, that CCP

officials were present in each, and second, that these officials had authority to control

company operations.  *See I&D Mem.* at 12 (emphasis added) ("As *AFA*, we find that

CCP officials are present in each of Yama's privately-owned input suppliers as

individual owners, managers and members of the boards of directors, and that this

gives the CCP, as the government, meaningful control over the companies and their

resources.").

### 4. The Department's Inclusion of Ocean Freight and VAT in the "Benchmark" for Synthetic Yarn and Caustic Soda

Addressing the essential statutory element of specificity, *Yama I* did not reach

Yama's claim that Commerce erred in its treatment of ocean freight and value-added

tax in conducting its adequacy-of-remuneration analysis.  The court addresses that

claim now.

To determine whether the prices Yama paid for synthetic yarn and caustic soda

in China constituted adequate remuneration, Commerce applied its regulation,

19 C.F.R. § 351.511.  Under the "tier-one" method set forth in the regulation, 19 C.F.R.

§ 351.511(a)(2)(i), Commerce measures the adequacy of remuneration by comparing the

government price to a "comparison" price (also called a "benchmark" price), which

under the tier-one method is a market-determined price obtained from actual

transactions within the exporting country.  Because Commerce considered transactions

within China not to be market-determined and therefore not usable for that purpose, it

proceeded to calculate, as a "tier-two" benchmark, "a world market price where it is

reasonable to conclude that such price would be available to purchasers in the country

in question."  *Id.* § 351.511(a)(2)(ii).  For tier-one and tier-two benchmarks, the

Commerce regulations direct that "the Secretary will adjust the comparison price to

reflect the price that a firm actually paid or would pay if it imported the product.  This

adjustment will include delivery charges and import duties."  *Id*. § 351.511(a)(2)(iv).

Commerce stated in the Issues and Decision Memorandum that it added "freight,

import duties, and VAT to the world prices in order to estimate what a firm would have

paid if it imported the product."  *I&D Mem*. at 13.

Yama claims that "[t]he tier 2 benchmark prices the Department used are not

appropriate because they included ocean freight and VAT and are inconsistent with the

prevailing market conditions."  Pl.'s Mem. 43.  In support of this claim, Yama cites

19 U.S.C. § 1677(5)(E)(iv), for which the statute directs Commerce to determine

**adequacy of remuneration** "in relation to prevailing market conditions for the good or

service being provided or the goods being purchased in the country which is subject to

the investigation or review."[3]  19 U.S.C. § 1677(5)(E).  The provision adds that

---

[3] Yama also quotes a World Trade Organization Appellate Body Report, arguing that:

> [T]he prominence of domestic supply in the market relative to import supply is an important consideration when determining the generally applicable delivery charges for the good in question in the country of provision.  Such charges should not be determined simply on the basis that the comparison price used as a benchmark was derived from import prices or "world export" prices.

(continued. . . .)

"[p]revailing market conditions include price, quality, availability, marketability,

transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).  Yama

argues that the obligation to determine adequacy of remuneration in relation to

prevailing market conditions requires that "[u]nder the circumstances, the

Department's regulation on the use of delivered prices cannot be read in a vacuum"

and that Commerce should not adjust a benchmark for ocean freight and import VAT

when doing so is "contrary to 'prevailing market conditions.'"  Pl.'s Mem. 44.

     Yama's argument is unconvincing.  Missing are any specifics, drawn from record

evidence or elsewhere, as to how the Department's including delivery charges such as

ocean freight in the benchmark price, which Commerce was directed to do by 19 C.F.R.

§ 351.511(a)(2)(ii) ("This adjustment *will include delivery charges* and import duties"

(emphasis added)), should be found to be contrary to "prevailing market conditions" in

the situations the two inputs presented.  Nor does Yama claim that the regulation, on its

face, is contrary to 19 U.S.C. § 1677(5)(E).

     With particular respect to the Department's adding input VAT to the import

price, Yama argues that including input VAT was incorrect.  Yama gives as its reason

---

Mem. of Law in Supp. of Pl. Yama Ribbons and Bows Co., Ltd.'s 56. 2 Mot. for J. upon
the Agency R. 45–46 (Aug. 9, 2019), ECF No. 26 (quoting Appellate Body Report, *United
States—Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*,
¶¶ 4.249 & 4.306, WTO Doc. WT/DS436/AB/R (adopted Dec. 8, 2014)).

that in China, input VAT is credited against output VAT and rebated to the exporter

"up to the input VAT amount paid on the previously purchased raw material" such

that "VAT is not part of the cost of the raw material because it will either be offset

against output VAT or rebated upon exportation."  Pl.'s Mem. 46–47.

       At oral argument held on February 13, 2020, the court inquired about the

Department's treatment of VAT when applying the tier-two benchmark method of

19 C.F.R. § 351.511(a)(2)(ii).  Defendant responded in a written submission.  Def.'s Resp.

to the Court's Request for Suppl. Briefing (Mar. 16, 2020), ECF No. 41.  Citing detailed

record evidence, defendant explained that it included VAT when determining the price

Yama paid for synthetic yarn and caustic soda and, to achieve an "apples to apples"

comparison, also included VAT in each benchmark price.  *Id*. at 2.  The submission

informs the court that Commerce used this same method for ocean freight.  *Id*.

       Yama submitted a reply to defendant's submission.  Pl.'s Reply to Def.'s Resp. to

the Court's Request for Suppl. Briefing (Mar. 23, 2020), ECF No. 42.  In its entirety,

plaintiff's submission states: "Plaintiff Yama Ribbons and Bows Co., Ltd., concurs with

the government's response to the Court dated March 16, 2020.  Yama has no further

comments."  *Id.*  In declining to comment, Yama leaves unanswered the question of

why the court must hold that the Department's "apples to apples" comparison method

of addressing ocean freight and VAT failed to satisfy the requirements of 19 U.S.C.

§ 1677(5)(E).

For the reasons stated above, the court does not find merit in Yama's claim that

Commerce acted contrary to law in its treatment of ocean freight and VAT in

calculating the subsidy rates for synthetic yarn and caustic soda.

### 5.  The Department's Decisions on Synthetic Yarn and Caustic Soda in the Remand Redetermination

In the Remand Redetermination, Commerce stated that "[w]e have reevaluated

the information on the record regarding the Synthetic Yarn and Caustic Soda for LTAR

subsidies and addressed the 'specificity' requirement in the statute, pursuant to the

Court's instructions," adding that, after doing so, "Commerce finds that these subsidies

meet the specificity requirements of the Act." *Remand Redetermination* at 10.

The following provisions in the Tariff Act are pertinent to the specificity issue

presented by this case:

> Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:
>
> (I)      The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II)     An enterprise or industry is a predominant user of the subsidy.

     (III)    An enterprise or industry receives a disproportionately large
              amount of the subsidy.

     (IV)    The manner in which the authority providing the subsidy has
              exercised discretion in the decision to grant the subsidy indicates
              that an enterprise or industry is favored over others.

     In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the
     administering authority shall take into account the extent of
     diversification of economic activities within the jurisdiction of the
     authority providing the subsidy, and the length of time during which the
     subsidy program has been in operation.

19 U.S.C. § 1677(5A)(D)(iii).  Commerce based both of its specificity determinations, i.e.,

for synthetic yarn and for caustic soda, solely on the first factor (subclause (I)).  *Remand*

*Redetermination* at 22.

     For purposes of the Remand Redetermination, Commerce placed new

information on the record, consisting of a new subsidies allegation ("NSA") that the

petitioner (Berwick Offray LLC, the defendant-intervenor in this litigation) submitted in

the previous administrative review of the Order, and the Department's decision

memorandum in response to the NSA.  *Id.* at 7 (identifying as new record information

*Placing Documents on the Record* (Int'l Trade Admin. May 14, 2021) (PPR Docs. 1–5)

("*2015 NSA Information*")).

     In its specificity analysis, Commerce also noted the Chinese government's

response to the Department's requests, submitted during the sixth review, for lists of

the industries that purchase synthetic yarn and caustic soda, with volume and value

data on such purchases, and related information, including the resource or classification

scheme the government normally relies upon to define industries and classify

companies within an industry.  *Id.* at 14.  Considering the Chinese government's first

reply unresponsive to the inquiry, Commerce again asked for the information, and the

government of China replied that it did not maintain the requested information.  *Id.*  In

the Remand Redetermination, Commerce concluded that necessary information was

missing from the record and that the use of facts otherwise available therefore was

warranted, as well as an adverse inference for its finding that the Chinese government

failed to cooperate by not acting to the best of its ability in providing requested

information.  *Id.* at 14–15.

For synthetic yarn, Commerce relied on exhibits to the NSA to reach a finding

that "synthetic yarn is used solely by the textiles industry in China."  *Id.* at 15 (citing

*2015 NSA Information*, Attach. I at Ex. II-E & II-P).  From this finding, Commerce

reasoned as follows: "In past cases, Commerce has found that when use of an input was

limited to eight industries, the industries were limited in number in China, and thus,

the subsidy was *de facto* specific."  *Id.* (footnote omitted).  Commerce went on to

conclude that "[c]onsequently, we find that the use of synthetic yarn by one industry

(the textiles industry) is limited in number and, as a result, the Provision of Synthetic

Yarn for LTAR program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act

[19 U.S.C. § 1677(5A)(D)(iii)(I)]." *Id.* at 15–16.  For caustic soda, Commerce again relied

on the NSA submission to conclude that "caustic soda is used by only a limited number

of industries (*i.e.*, chemicals, pulp and paper, aluminum, food, water treatment, and

textiles) in China." *Id*. at 16 (citing *2015 NSA Information*, Attach I. at Ex. III-B & III-H).

Commerce considered six industries to be sufficiently "limited in number" within the

meaning of 19 U.S.C. § 1677(5A)(D)(iii).

### 6.  Yama's Objections to the Remand Redetermination

Yama argues that the Department's use of facts otherwise available and adverse

inferences was impermissible because this Court's previous order "determined that the

GOC fully answered the relevant questions and the administrative record is complete in

that regard, leading to no finding of a subsidy predicated on substantial evidence on the

record." Pl.'s Comments 3.  In a similar vein, Yama argues that the specificity issue in

this case is "moot" because "[o]nce the Court determined that the GOC answered the

question about any law, plan, or policy regarding LTAR, the inquiry should have

ended." *Id*. at 5.

Yama misreads the court's decision in *Yama I*.  Contrary to the assertion that the

specificity issue is moot, the court ordered Commerce, upon reconsidering the Final

Results, to reexamine the issue of specificity.  Had the court ruled as Yama asserts, it

effectively would have ruled that no countervailing duties were lawful in this case—a

result the court did not reach.  Moreover, while the administrative record may have

been described as "complete" as of the time of issuance of the Final Results, Commerce

reopened the record to place new information on the record and used that information

in its analysis of the specificity issue.

Yama argues that the Department's use of information from a prior review in the

specificity analysis was improper.  *Id*. at 6–7.  The court disagrees.  Having directed

Commerce to conduct an analysis of the specificity issue as to both inputs, the court sees

nothing improper in the Department's reopening the record to admit the NSA

information.  Commerce concluded from the NSA information that the textiles industry

was the sole user of synthetic yarn in China.  Yama placed no information on the record

that could call this finding (which seems intuitively obvious) into question.  Nor did

Yama place any information on the record that would detract from the Department's

finding, also based on the NSA information, that only six industries in China used

caustic soda.

Rather than question the two findings before the court, Yama argues that

Commerce incorrectly was "looking at specific inputs, such as synthetic yarn and

caustic soda," "rather than looking at LTAR overall," adding that "[i]t is not the input

that is important to the question of specificity but the overall 'program' law, plan, or

policy."  *Id.* at 7.  In Yama's view, "[f]or decades, Commerce has gone unchallenged in

its framing of the specificity question to ensure that no industry in China can win this

argument," which it considers "neither reasonable nor fair." *Id*. A flaw in Yama's

position is the statute itself.

The Tariff Act considers a subsidy to be *de facto* specific if "[t]he actual recipients

of the subsidy, whether considered on an enterprise or industry basis, are limited in

number." 19 U.S.C. § 1677(5A)(D)(iii)(I). While the "textiles industry" in China would

appear to be a broad category composed of many individual industries, the statute

speaks to this issue as well, instructing that "any reference to an enterprise or industry

is a reference to a foreign enterprise or foreign industry and includes a group of such

enterprises or industries." *Id*. § 1677(5A)(D)(iii). Even a broad, multifaceted industrial

category such as the "textiles industry" may be considered a single recipient such that a

subsidy may qualify as "specific."

On the record of this case, Yama's assertion that the issue of specificity depends

on "the overall 'program' law, plan, or policy," as opposed to the "input," Pl.'s

Comments 7, is also unconvincing. The Tariff Act directs that "in evaluating the factors

[for determining specificity as a matter of fact] set forth in subclauses (I), (II), (III), and

(IV), the administering authority shall take into account . . . the length of time during

which *the subsidy program* has been in operation." 19 U.S.C. § 1677(5A)(D)(iii) (emphasis

added). But as the court explains below, the record, considered as a whole and as

enlarged during the remand proceeding, permissibly allowed Commerce, based on

findings from actual evidence and on adverse inferences, to conclude that a subsidy

"program" (a term not defined in the statute) existed during the POR that provided

synthetic yarn and caustic soda for less-than-adequate remuneration and to determine

that the specificity requirement was met.

From actual record evidence (as opposed to adverse inferences), Commerce

reached valid findings that the prices at which Yama was able to buy synthetic yarn and

caustic soda were less than the Department's tier-two benchmarks.  Yama's only

challenges to the benchmarks concerned ocean freight and VAT (which the court

rejected, as discussed previously).  Thus, the record permissibly allowed Commerce to

find that Yama was able to purchase the two inputs for less than it could have obtained

them as imports into China.  *See I&D Mem.* at 13 (explaining that Commerce added

freight, import duties, and VAT to world prices in order to estimate what a firm would

have paid if it imported the product).

The record also contained information submitted by the government of China

concerning the percentage of Chinese production of both synthetic yarn and caustic

soda that was by producers in China in which the government maintained a majority

ownership.  *See GOC Additional Questionnaire Response* at 32, 53.  While the GOC

informed Commerce that none of Yama's suppliers of these two inputs were

government-owned, Commerce acted within its authority in drawing an adverse

inference of government control of these firms' operations from the GOC's non-

cooperation in responding to the question of CCP presence, as the court discussed

previously.  That non-cooperation denied Commerce access to information from which

it could assess "the length of time during which the subsidy program has been in

operation."  19 U.S.C. § 1677(5A)(D)(iii).

      Yama objects that "Commerce cannot hold the GOC accountable for information

it does not possess," Pl.'s Comments 6, but its objection is centered on the GOC's

providing only some, but not all, of the information on the industrial sectors consisting

of synthetic yarn and caustic soda producers and, specifically, the GOC's claim that

Article 25 of the Statistics Law of China did not allow public disclosure of the names of

the specific synthetic yarn and caustic soda producers in which it maintained an

ownership interest.  *See I&D Mem.* at 10.  But as the court's review of the specificity

analysis shows, the GOC's refusal to provide the names of those companies was not

instrumental in the adverse inferences that controlled the outcome of that analysis,

which were the adverse inferences concerning CCP participation in, and effective

government control of, Yama's synthetic yarn and caustic soda suppliers.

      In summary, the record revealed the percentage of Chinese production of both

synthetic yarn and caustic soda that was by producers in China in which the

government maintained a majority ownership and demonstrated that Yama was able to

obtain these two inputs for less than what it would have paid had it imported them.  To

this record evidence is added the adverse inferences that Yama's suppliers were subject

to operational control of the Chinese government.  Commerce, therefore, permissibly

concluded that the domestic prices for the two inputs in China were distorted by the

government's influence.  With what evidence it was able to obtain, and with the adverse

inferences Commerce had authority to draw, Commerce also could conclude,

permissibly, that the government's role in the LTAR sales of the inputs amounted to

government "programs" that were in existence during the POR.

         In holding that the Final Results did not conduct an adequate analysis of

specificity, *Yama I* was critical of the Department's failure in the Issues and Decision

Memorandum to address, or even mention, the Chinese government's questionnaire

responses indicating the lack of a government program to provide synthetic yarn or

caustic soda at LTAR.  *Yama I*, 45 CIT at __, 517 F. Supp. 3d at 1340.  Commerce now has

addressed this evidence as part of its specificity analysis.  *See Remand Redetermination*

at 13.  Yama argues that "[t]he whole purpose of this LTAR exercise is to determine

whether the GOC has attempted to manipulate the market, either production quantity

or prices, for synthetic yarn and caustic soda."  Pl.'s Comments 8.  This formulation is

not quite correct.  On the issue of *de facto* specificity as determined according to

19 U.S.C. § 1677(5A)(D)(iii), the question is whether Commerce permissibly could

conclude on this record, based on its findings and its adverse inferences, whether the

government's influence *did* affect the market.  Even if the government of China's

statement that it did not maintain what it considered to be a "program" or "programs"

for the supplying of these inputs is taken at face value, it still would leave the issue of

specificity unresolved.  On this record, Commerce acted within its statutory authority in

identifying a government role in the production and sale of each of these inputs, which

Commerce permissibly found to be sold for LTAR, that amounts to the existence of

"programs" for purposes of 19 U.S.C. § 1677(5A), regardless of whether the government

of China would consider them to be such.

        Finally, Yama argues that "there was neither explicit nor implicit authority for

Commerce to add to the record" and that the information added "simply supports

Commerce['s] impermissible attempt at a *post hoc* rationalization."  Pl.'s Comments 9.

Plaintiff submits that *Yama I* held that it was the Department's "<u>analysis</u> that was

lacking, <u>not the data</u>."  *Id*. (emphasis in original).  Because, as the court discussed above,

*Yama I* remanded the Final Results for the conducting of a new specificity analysis,

Commerce had implicit authority to reopen the record in an effort to obtain data it

considered necessary to its doing so.  Because the Remand Redetermination is a new

determination, based on an enlarged record and new reasoning, it cannot accurately be

described as a *post hoc* rationalization.

## III.  CONCLUSION

For the reasons discussed previously, the court sustains the Department's

decision in the Remand Redetermination not to impose countervailing duties upon

Yama with respect to the Export Buyer's Credit Program.

For reasons also discussed above, the court concludes that the Remand

Redetermination remedied the deficiencies the court identified in *Yama I* with respect to

the Department's analysis of the provision of synthetic yarn and caustic soda for LTAR

and reached results supported by substantial record evidence.

The court will enter judgment sustaining the Remand Redetermination.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: December 8, 2022
New York, New York